STATE OF FLORIDA ex. rel. J. DENNIS WOLFE vs. WILLIAM KIRKE, JUDGE OF THE COUNTY COURT OF ESCAMBIA COUNTY.

1. Courts by common law had no power to admit an attorney or counsellor to practice.

2. Courts by common law had the power to disbarr attorneys after admission when guilty of such conduct as would justify it.

3. The statutes of this State regulating the admission of attorneys do not affect the power of courts to disbarr an attorney. Such power is essential to the maintenance of their own dignity and the respectability of their officers.

4. Where it is intended to apply to the court to have an attorney disbarred, the proper course of proceeding is to present the charge to the court, and it will direct a rule to show cause why the name of the attorney should not be stricken from the roll, if a case proper for the action of the court be presented; this rule is awarded, served, and returned, and the court hears and determines the matter according to law.

5. A regular complaint against an attorney ought not to be received and acted on unless made on oath, and the charge made should be specific and particular, so that the officer may be aware of the precise nature of the accusation he is to meet.

6. The county courts of this State have the power to disbarr an attorney and to deny him the rights of an officer of that court, but their judgment cannot extend beyond a denial of the privileges of an attorney in that court. It does not directly affect his rights in other courts.

7. While it is essential that the authority of the courts should remain unimpaired in the exercise of this great and peculiar power, it is not the less so that the rights of the officer should be protected against a wrongful exercise of it, and this court will interpose when the inferior court has decided erroneously on the testimony, and a plain case of wrong and injustice is brought to its attention.

8. The appropriate remedy in a case of this character is by a writ of mandamus, rather than an appeal from the order of the inferior court, or writ of error.

Mandamus to judge of the county court of Escambia county. The facts are fully stated in the opinion.

*A. J. Peeler* for the Relator.

*A. C. Blount* for Respondent.

WESTCOTT, J., delivered the opinion of the court.

This case arises out of an order of the county court of Escambia county, striking the name of J. Dennis Wolfe, an attorney of that court, from its roll of attorneys, and depriving him of the rights and privileges of an attorney of that court.

Upon the filing of a transcript of the record of the judgment of the county court containing the evidence there introduced, and a petition praying an alternative writ of mandamus, this court, after inspection, granted the prayer of the petition, and awarded an alternative writ of mandamus directed to the judge of the county court. The judge of the county court has made his return to the alternative writ in the words following:

"That he claims the right, as judge of the county court of Escambia county, upon the facts apparent upon the record accompanying the petition in this case, to disbarr the said J. Dennis Wolfe from practicing as an attorney-at-law in his court, and he admits that he has caused the name of the said Wolfe as attorney as aforesaid to be stricken from the roll of attorneys of his said court, as stated in said petition."

To this return a demurrer is filed, and joinder in demurrer.

The grounds of the demurrer are two:

*First.* "That the respondent, as judge of the county court of Escambia county, had not the power or authority by law to disbarr the relator, or to strike his name from the roll of attorneys of his court, or to refuse him the rights and privileges of an attorney therein."

The right of the petitioner to practice as an attorney in the

county court is not derived from any order or proceeding in that court. The law regulating the subject (Thompson's Dig., 322, 333,) provides: "It shall be the duty of any person wishing to obtain a license to practice law in the courts of this State, to present to one of the judges of the circuit courts satisfactory evidence of good moral character, and that he is twenty-one years of age, whereupon the judge shall examine into the qualifications of the applicant, and if found qualified he shall grant him a license to practice in the several courts of this State."

\*       \*       \*       \*       \*       \*       \*       \*       \*

"No person shall be permitted to appear as an attorney and counsellor-at-law in any cause in the courts of this State, until he shall have produced to the court in which he proposes to practice, a license signed by one of the circuit courts, or a certificate under the hand and seal of a clerk of some one of the circuit courts of the United States, of his having been admitted to practice in said circuit court, which license or certificate shall be entered upon the minutes of the court in which the said attorney wishes to practice, and the original returned by the clerk to said attorney."

It will be thus seen that the right to practice in the county court results from the grant of a license to practice in the several courts of this State by a judge of one of the circuit courts of this State, and that upon the production of a license so signed it is required that he shall be permitted to appear as an attorney and counsellor-at-law in any of the courts of this State. The petitioner having been so admitted by a judge of the circuit court, and having taken the necessary steps to become entitled to practice in the county court, contends that there is no power in the county court to prohibit him from practicing in that court. That the right to practice in the county court does not emanate from any power which it has over the admission of attorneys is plain; that the judge of the county court has no authority to deny admission as an attorney of that court to one who exhibits "a license to practice in the several courts of

this State granted in conformity to law," is clear, but does it follow that because the admission of the party to practice does not result from any exercise of power by the county court, that after such admission the county court cannot, after due process of law, deny the party so admitted the rights of an attorney of that court for good cause? Does not the grant of the license to practice in the several courts by the circuit court, operate simply to entitle him to the privilege of an attorney in the several courts without further examination, and does he not, after such admission, become subject to be denied the right to practice before that court? These questions involve an inquiry into the effect of the statute.

What was the law independent of the statute? At common law the courts had no power to admit attorneys or counsellors, and it has been held that for this reason this is a power not inherent in a court, and in the absence of constitutional provisions a matter for regulation by the Legislative Department of the Government. It cannot be claimed as a part of the inherent power of courts, or as resulting necessarily from any power which they have. Indeed, barristers or counsellors-at-law in England were never even appointed by the courts, but were called to the bar by the Inns of Court, which were associations not vested with even corporate powers, nor could the courts control the discretion of the Inns of Court as to whom they would call. In England the power of the courts to appoint attorneys has been from time to time regulated by statute. There were some acts anterior to that date, but the act which gave shape to the matter, and became a model, was the act of 4 Hen. IV., chapter 18, which, among other things, provided "that all attorneys should be examined by the justices, and by their discretion their names shall be put upon the roll," and the matter has been further controlled and regulated by subsequent statutes. 3 Jas. I., ch. 7; 6 and 7 Vict., ch. 73; 20 and 21 Vict., chap. 77.

In some of the American colonies the power of appointing attorneys was exercised by the Governor of the colony, who

282        SUPREME COURT.

The State of Florida vs. William Kirke—Opinion of Court.

usually took advice from the Chief-Justice of the Supreme Court.

Before the statutes above-mentioned, which regulated the subject and gave the courts the power to examine and admit attorneys, the courts would not suffer suitors to have an attorney, because the words of the writ were to command the defendant to appear, and that was always taken to be in proper person. At common law all parties had to appear in person. Attorneys, anterior to the statutes, could only be had by those who had permission of the King, and such attorneys were simply attorneys in fact. It was the custom of the King to direct his writs to the judges, commanding them to receive such persons by their attorney, and the judges were bound so to do. Fitz Herbert's Reports, 59.

In New York, by statute, persons upon whom the degree of Bachelor of Laws has been conferred by the Law School of Columbia College, are entitled, without any further examination, to be admitted to practice in the courts of that State, and the Court of Appeals has compelled the Supreme Court against its will to admit them. Selden, J., in delivering the opinion of the court, in the matter of the application of Henry W. Cooper, (22 N. Yk. Rpts., 81, where this question arose,) says : "So far as I can see, admission may as well have been by the Governor, the Attorney-General, or any other public functionary, as by the courts. It is a question of mere legislative discretion." At common law the courts, except certain inferior courts where such custom prevailed, had thus no power over the subject of admission of attorneys, and the statute of this State, unless the English statutes upon the subject were in force, was necessary in order that attorneys might be admitted to practice in the courts; for in the absence of statutory regulations the common law rule that all parties should appear in person would have been operative. In the construction of statutes of this kind the rule is simple. We first find "how the common law stood at the making of the act." From that we ascertain what the mischief was for which

the common law did not provide. This being done, the statute we are construing gives us the remedy, "and it is the business of the judges so to construe the act as to suppress the mischief and advance the remedy." Co. Litt., 11, 42; 1 Black., 87.

We are of opinion that the mischief here was the want of common law power in the courts to admit attorneys, and that the Legislature, in the exercise of a power which it possessed beyond question, proposed by this act to place the control of the subject of admission in the courts; that the circuit courts being courts of general jurisdiction this power was vested in them. There is nothing in the language of the act, or in the common law evil that it was to remedy, which in any manner justifies the idea that its purpose or effect was to do anything more than to provide a power in the circuit courts to "grant licenses to practice law," upon the exhibition of which, signed by one of the judges, it should be recorded by the other court upon its minutes, &c.

The statute of Westminster first, 3 Ed., 1 chap., 29, which was before there was any recognized class of practitioners as attorneys, provided "that if any sergeant, counter, or other, do any matter of deceit or collusion in the King's Court, or consent to it, to deceive or entrap the court or one of the parties, he shall be no more heard in the court to plead for any one." Lord Coke says these practices "were against the common law, and therefore this act was made in affirmance of the common law." 2 Ins., 213, 214.

And it is clear that even counsellors who were neither officers of any court nor invested with any judicial office, but barely practiced as counsellors, were subject to be controlled by this power of the courts. 2 Reeves Hist., 126; 1 Hawk., P. C., ch. 27, page 461; 3 Burr., 1256.

The power to punish as well by imprisonment as by prohibiting parties from practicing, was a power incident to courts; existed before there was any recognized class of attorneys, and

when in fact no roll of attorneys existed, for the first roll was introduced by 4 Hen. IV., ch. 18.

That courts have had and exercised a summary jurisdiction of this character over their attorneys, cases from the earliest period to the present time establish. 4 Moore, 171; 7 Moore, 376; Hawkins, P. C., 369; 1st Yerg., 238; 48 Ind., 49.

Justice Nelson, in the very recent case of Ex parte Joseph H. Bradley, says: "We do not doubt the power of the court to punish attorneys for misbehavior in the practice of the profession. This power has been exercised and recognized ever since the organization of courts." This was said in reference to the disbarring of an attorney, the matter then under investigation. The right of the courts to exercise this power existed before they controlled the subject of admission. One was a common law power, the other a power derived from statute. The rule applicable to the construction of statutes is, that an act in derogation of the common law is to be construed strictly. In this case, however, we do not think that the statute has anything to do with the power of the courts over an attorney after he has been admitted. It does not propose to affect it, and no principle of construction need be invoked. It was urged at bar that the county court was not such a court as possessed this power, and that to admit its power to this extent is to admit its power to control the Circuit and Supreme Courts in the matter. Each court possesses this power as a necessary incident to its organization. The county court having disbarred an attorney does not affect his right to practice in the other courts, and if he has been admitted in the County and Supreme Courts, and has become entitled to the rights of an officer there, the action of the circuit court can only affect his right to practice in that court; because the power to admit is one thing, and the power to disbarr another. The one is confined to the circuit courts, the other is possessed by the County and Supreme and Circuit Court.

The case in 1 Johnson's cases, 183, cited by petitioner, was in an inferior court, and the Court of Errors in New York, in re-

veiwing the decision of the Court of Common Pleas, say : " By the Constitution of this State the power of appointing attorneys was transferred to the respective courts. The Constitution did no more, however, than to transfer or vest in the courts the power of appointment which had before been possessed by the Governor of the Colony. The expression that they should be governed by the rules and orders of the court, *gives no additional authority over them, and they would have been equally subject to those rules and orders if the Constitution had been silent in this respect.*" The court further say that it takes jurisdiction of the case upon the ground that it has " the power of correcting any abuse or injustice of inferior courts towards their officers."

The fact that a removal by the Court of Common Pleas, under the *statutes* of New York, would have operated to prevent his admission to practice in the Supreme Court, was one of the matters which the court urged as a reason for its exercise of its general superintending power; but the court does not sustain the idea that a removal by the Common Pleas would operate to remove from the other courts. The statute would not permit any other State court to admit the party to practice, if another State court *had before his application disbarred him.*

In 1 Cal., 190, the application was for an alternative writ of mandamus, and the matter appears to have received but little attention. The court in this case say : " The proceedings in the court below are irregular, and inasmuch as the relators have received from this court a license to practice as attorneys at law in the Supreme Court, and by the rules of court are authorized by virtue thereof to practice in all the courts of this State, we are called upon to afford relief."

As we understand the opinion, the " irregularity " in the proceedings was the ground of their interference, and not the opinion that the action of the court below could directly affect the standing of the attorney in the Supreme Court. As to this point, the Supreme Court of California bases its views upon the single authority in 1 Johnson's cases, which we have be-

fore commented upon, and which we have seen lays down the rule to be that the Court of Common Pleas in New York, though an inferior court, possessed, independent of statutory authority, the power to disbarr.

Whether the county court is an inferior court of *limited juris-diction*, within the meaning of the authorities upon that subject, we do not determine. It may be remarked, however, that it is by statute declared a court of record, with general powers to carry out its jurisdiction; that its system of pleading and practice, in other than probate and criminal matters, is similar to that of the circuit court, and that under the Constitution it has a considerable jurisdiction.

We have found no authority which would sustain the position, that a court with the jurisdiction and power of the county court did not possess this power, and none has been cited at bar.

We are of the opinion that there is no want of power in the county court, in a proper case, and upon proper proceedings, to disbar one of its attorneys.

It remains to consider the second ground of demurrer, which is " That the record which accompanies relator's petition, upon which respondent relies in his return as justification for the disbarrment of the relator, shows no sufficient cause in law or in fact for disbarring the relator or striking his name from the roll of attorneys of the county court of Escambia county, or refusing him the rights and privileges of an attorney at law thereon."

We do not doubt our power to exercise control over inferior courts in matters of this character in certain cases, nor that the manner of proceeding in this case is correctly conceived. 1 John. cases, 181; Ex parte Burr., 9 Wheat., 530; Tapping on Mand., 14, 45; Hurst's case, 1 Lev., 75; Leigh's case, 3 Mod., 335; White's case, 6 Mod., 18; 4 Bac. Ab., 501; 3 Salk., 230; 2 Tomlin's Law Dic., 514; Ex parte Jos. H. Bradley, lately decided in Sup. Ct. U. S.

In some of the States the remedy has been by appeal from

the judgment of the court below, (see these cases reviewed in 22 N. Yk. Rpts., Ct. of Appeals, 68,) but we think that the question is settled by the late decision of the Supreme Court of the United States, in the case of Ex parte Joseph H. Bradley, where mandamus was adopted and sustained. Say the court, in Ex parte Bradley : "This writ is applicable only in the supervision of the proceedings of inferior courts, in cases where there is a legal right without any existing legal remedy. It is upon this ground that the remedy has been applied from an early day, indeed since the organization of courts and admission of attorneys to practice therein down to the present time, to correct the abuses of inferior courts in summary proceedings against their officers, and especially against the attorneys and counsellors of the courts. The order disbarring them, or subjecting them to fine and imprisonment, *is not reviewable by writ of error*, it not being a judgment in the sense of the law for which this writ will lie. Without, therefore, the use of the writ of mandamus, however flagrant the wrong committed against these officers, they would be destitute of any redress. The attorney or counsellor disbarred from caprice, prejudice, or passion, and thus suddenly deprived of the only means of an honorable support of himself and family, upon the contrary doctrine contended for, would be utterly remediless." Nor have inferior courts an unlimited discretion in such matters, for if it be exercised with manifest injustice there is a remedy. Tapping on Mand., 14.

It must be a sound discretion and according to law. 19 Howard, 13 ; 9 Wheat., 530 ; Ex parte J. H. Bradley.

In the cases of Ex parte Secombe and Ex parte Jos. H. Bradley there is apparently a conflict in the views of the court.

In Ex parte Jos. H. Bradley the court say : "The order disbarring them (attorneys) or subjecting them to fine and imprisonment, is not reviewable by writ of error." In Ex parte Secombe the court, when reviewing an order of similar character, say : "It is not necessary to inquire whether this decision of the territorial court can be reviewed here in any other form of pro-

ceeding. But the court are of opinion that he is not entitled to a remedy by mandamus. Undoubtedly the judgment of an inferior court may be reversed in a superior one which possesses appellate power over it, and a mandate may be issued commanding it to carry into execution the judgment of the appellate tribunal. But it cannot be reviewed and reversed in this form of proceeding, however erroneous it may be or supposed to be."

Again, in Ex parte Secombe, which was a case in which the attorney was disbarred for what was alleged to be a contempt in open court, without notice or hearing, and during his absence, the court say: "These principles (those above stated denying the remedy by mandamus) apply with equal force to the proceedings adopted by the court in making the removal;" that is to say, that mandamus is not the remedy to correct and set aside such irregularity, or to relieve the attorney from its consequences;" while in the very recent case of Ex parte Bradley it is said: "The proceeding is admitted to be the recognized remedy when the case is outside of the exercise of this discretion;" that is, as we understand it, a sound discretion, "and is one of irregularity or against law, or of flagrant injustice, or without jurisdiction." Chief-Justice Taney, in Ex parte Secombe, speaking of the exercise of discretion, says: "The power, however, is not an arbitrary and despotic one, to be exercised at the pleasure of the court, or from passion, prejudice, or personal hostility; but it is the duty of the court to exercise and regulate it by a sound and just judicial discretion, whereby the rights and independence of the bar may be as scrupulously guarded and maintained by the court, as the rights and dignity of the court itself."

From a review of the English and American cases on this subject, we are of opinion that if the evidence in this case discloses that gross injustice or wrong has been done, this is the only remedy, and it should be administered. The matter charged here is not for any contempt in the presence of the

court, nor is there any fine or sentence of imprisonment resulting from contempt.

Under the Constitution of this State, the power of this court, with reference to inferior tribunals, is much like that of the Court of King's Bench in England. 2 Caine's Cases in Error, 309; State of Fla., ex. rel. Att'y Gen. vs. W. H. Gleason, 12 Fla. Repts.

Its jurisdiction is more extensive than that of the Supreme Court of the United States in respect to writs of this character. In the Supreme Court of the United States they can be used only as incidents to appellate jurisdiction. Here they are writs which appertain to the original jurisdiction of this court, and they can be made available when they are the proper remedies.

"Writs of mandamus are granted in England to restore officers in corporations, colleges, &c., unjustly turned out, and freemen wrongfully disfranchised." 2 Tomlin's Law Dic., 372.

It is also the remedy "to restore an attorney in an inferior court, for the office of an attorney is necessary to the administration of justice, and is of a public concern." Hurst's case, 1 Lev., 75; Leigh's case, 3 Mod., 333; White's case, 6 Mod., 18.

So to restore a school-master. Parkinson's case, Comb., 144.

So to restore one to the stewardship of a court. Stamp's case, 2 Lev., 18.

So to restore a clerk of the peace. Rex vs. Owen, Comb., 317.

So to restore the register of a bishop's court. Anon Comb., 264.

If it be true, as held by the Supreme Court of the United States, that a writ of error does not lie to an order disbarring an attorney, then to deny the remedy by mandamus is to make the office of an attorney one entirely dependent upon the pleasure of inferior courts; for if a writ of error cannot be prosecuted in that court, it cannot be under our statute here. We have been able to find no case in which the broad proposition that an inferior court can, though it conform to the proper rules of

practice, without cause disbarr an attorney, and there is *no remedy*, is sustained. And if there is no remedy by writ of error (under the statute) a refusal here to grant relief, if it be a case of hardship and plain wrong upon the testimony, would be to establish, without any controlling precedent in point, a rule both iniquitous and unjust in the extreme; making a large and most respectable class of persons, who have given their lives to their profession, subject to be deprived of a right, in this State conferred by statute, at the pleasure of inferior courts, from " passion, prejudice, or personal hostility," without any means of redress.

An attorney's rights in the county court result, in this State, from statute. When admitted as an officer of the court, the rights and the incidents to his position are not held *durante bene placito*. He cannot be said to hold his rights, privileges, or franchises at the absolute will and pleasure of each court in which the statute authorizes him to practice. Under the laws of New York, the possession by a graduate of the Law School of Columbia College, of a diploma conferring the degree of Bachelor of Laws, entitled a party, being of proper age, to admission to practice. H. W. Cooper presented this evidence of his qualifications, which gave him, under the statute, a right of admission, and it was denied by the Supreme Court. An appeal was taken to the Court of Appeals. Comstock, C. J., and Justices Denio and Wright held that an appeal could not be taken from such an order, and Seldon, who delivered the opinion of the Court, (the Chief-Justice and Justices Denio and Wright dissenting,) sustained the appeal only on the ground that the statute regulating appeals gave the Court of Appeals "jurisdiction to review every actual determination in a final order affecting a substantial right, made in a special proceeding; " the court holding that it was a special proceeding. We have no similar statute here, and it is not clearly seen how this order or judgment could be brought here, or to the circuit court by appeal or writ of error under our Constitution and laws. See also 1 Peck, 292.

The State of Florida vs. William Kirke—Opinion of Court.

One of the offices of a mandamus, which is founded upon *Magna Charta*, is to restrain *excesses* of inferior tribunals, and it is issued to inferior courts to enforce the *due exercise* of those judicial or ministerial powers with which they are invested. It is in its nature a writ of restitution. 3 Black. Comm., 111, 265. Tapping on Mandamus, 105, 5, 199; Bac. Abridg't, title Mandamus, let. D, page 273, let. E, page 278; 3 Steph. N. P., 2292; 5 Peters, 190; 9 Wheat., 521; Ex parte J. H. Bradley.

In Rex vs. Barker, 3 Burr., 1265, Lord Mansfield said: "Where there is a right to execute an office or exercise a franchise, and a person is dispossessed of such *right*, and has *no other* specific legal remedy, this court ought to assist by mandamus, upon reasons of *justice*, as the writ expresses—*Nos*, A. B., *debitam et festinam justitiam 'in hac parte fieri volentes ut est justum,'* and upon reasons of public policy to preserve peace, order, and good government. A mandamus is a prerogative writ, to the aid of which the subject is entitled upon a proper case previously shown to the satisfaction of the court. It was introduced to prevent disorder from a failure of justice. Therefore it ought to be used upon all occasions where the law has established no specific remedy, and where in justice and good government there ought to be one. The value of the matter or the degree of its importance to the public police is not scrupulously weighed. If there be a *right*, and no other *specific remedy*, *this* should not be denied. *Writs of mandamus have been granted to restore an attorney to practice in an inferior court.*" (The italics in the last sentence are made by this court.)

In 5 Wendell, 114, speaking of the jurisdiction, the court say: "The jurisdiction of this court, by mandamus, is one of immense importance and extent. It extends to all inferior courts and tribunals;" and in speaking of controlling their discretion, it is said, "the security of the citizen is essentially increased whenever the territory of undefined discretion is circumscribed by the establishment of well-defined and clear principles."

The Supreme Court of Massachusetts in 1851, 7 Cush., 239, when in argument it was insisted that the writ could not be claimed as a right, said: "The application is to the discretion of the court; but this is not an arbitrary discretion, it is a judicial discretion; and when there is a right, and the law has established no *specific remedy*, this writ should not be denied. This writ was granted only to prevent a failure of justice, and is no doubt more freely and frequently granted at the present time than it was formerly."

The court, in 4 Hill, 583, say: "The mandamus is a prerogative writ which we have power to *issue* or *withhold, according to our discretion.*"

In this State, the *right* of an attorney to practice in the county court is a legal right resulting from statute. "His office of an attorney is necessary to the administration of justice, and is of public concern," as was remarked in White's case, 6 Mod., 18; and when "dispossessed of such right has no other specific legal remedy," but mandamus, and if, even upon the facts alone, a case of plain wrong is presented, we will correct it when the act is by an inferior court. There is no case which, while denying a remedy by writ of error, also denies a remedy by mandamus, and there is no good reason why the discretion of inferior courts in respect to their officers should not be controlled in matters of this kind.

While, as a general rule, a discretion will not be controlled by mandamus, yet it is going too far to say, as many of the courts have, without full examination, that there have not been able courts both in England and the United States that have done so, in cases where there is much less reason for exercising this power than in cases of this kind, where often the discretion would be made the vehicle for the satisfaction of personal ill-feeling; though we do not intend to say that such was the case here.

Lord Ellenborough, Chief-Justice, in the King vs. the Justices of Wiltshire, 10 East., 406, A. D. 1808, said: "The magistrates certainly had a discretion to exercise with respect to what was

reasonable time for giving the notice of appeal, and we think that in this case they have not exercised that discretion in a way that we ought to give effect to, but that we ought to interfere and correct it;" and a peremptory mandamus was awarded, directing them to enter continuances. In Rex vs. the Commissioners of the Flockwood Enclosure, 2 Chitty, 325, A. D. 1819, it was held that "in a motion for mandamus the court will not grant the writ where discretion was given to the commissioners, and no ground be shown that they have done it wrongfully."

The purpose of the motion was to effect an exchange of lands, which was a matter of discretion with the commissioners, and the Chief-Justice took particular notice of the fact that equality of interest or value was not shown.

In The King vs. The Justices of Lancashire, 7 D. & R., 692, where an appeal against an order of removal was dismissed on the ground that the appellant had not given the notice required by the rules of the justices, the court, thinking it reasonable that the appeal should be heard, granted a mandamus to the justices to enter continuances and hear the appeal. See also 3 B. & Ad., 704; 5 ibid., 671; 3 D., 310, 311.

Tapping on Mandamus, the ablest elementary writer on the subject, states the rule to be, "that the court will not interfere with the discretion of an inferior jurisdiction when it is exercised in accordance with reasonable rules of practice. It must, however, be clearly understood, that although there may be a discretionary power, yet if it be exercised *with manifest injustice,* the court is not precluded from commanding its due exercise, *the jurisdiction* under such circumstances being clearly established." Tapping on Mand., 14, 199; 3 B. & Ad., 704; 10 East., 404; 7 B. & C., 692; 3 Black., 265.

Taking the State of New York as an illustration of the practice and views of the American courts, we find in 1 Cowen, 15, it was insisted by the attorney that the granting a rule to set aside a fi. fa. was matter of discretion, and having been passed upon could not be opened. The Court of Errors directed the

inferior court, upon mandamus, to vacate and set aside the rule.

In 2 Cowen, 483, which was a motion for a mandamus to an inferior court, commanding them to grant a new trial, the court say, as to the remedy by mandamus, it may be proper to remark, that though in extreme cases we might interfere and control the court below upon questions of fact presented in the form of a motion for a new trial, yet it is a remedy which should be used very sparingly.

In 5 Wendell, 114, mandamus was granted to vacate a rule granting a new trial, where the matter was considered fully and discussed elaborately. In 18 Wendell, 103, the court hold that there is no *jurisdiction* by mandamus to control a discretion, after elaborate and full examination, the opinion of the court being delivered by the President of the Senate; but it is to be noticed in this case, that Chancellor Walworth remarked: "It is not necessary to the decision of this case that I should examine the *question of jurisdiction*, and I should prefer to delay a decision thereon until it could be more fully argued than was done in the present case." In 20 Wendell, 658, the rule laid down in the last case stated, was sustained and affirmed, except that it was there held "that ministerial officers and corporations may be required by this writ to act in a particular manner, or even to reverse what they have already done."

In this State it has been refused to control such discretion as is possessed by executive officers in auditing accounts; among other reasons, because it would be an indirect method of suing the State. 3 Fla., 202. It is hardly necessary to say that this is a very different case from the one at bar. These officers belong to a different department of the government.

In the case in 1 Johnson's cases, 182, before cited, which was a case precisely similar to this, the court say: "Two questions are made: 1. Whether the charges exhibited were supported by the proofs; 2. Whether the Court of Common Pleas possessed the exclusive power of determining on the conduct of its own

officers, or whether this court could interfere.    As to the first, the court say: "We are of opinion that the affidavits do not sufficiently support the charge of malconduct, but are rather to be considered as evidence of mistake than of intentional error.    At least the ground of removal was too slight for a punishment so severe."    As to the second point, the court held that they did have "the power of correcting any abuse or injustice of inferior courts towards their officers."

The *jurisdiction* we do not doubt; the power is clear.    The granting of the writ, however, is a matter to be exercised *with a sound discretion*, and we may refuse if we see proper; nor is the writ a matter of *right* to the petitioner; and the general rule is, without doubt, that matters of discretion or conclusions of fact will not be thus controlled.    The Legislative Department of this State has expressed its opinion to the effect that the orders and judgments of the circuit courts of the State, depending on their uncontrolled discretion, should be reviewable in the Supreme Court.    (Chap. 521, Laws of Fla.)    This case, however, is not embraced in that law, and it is only referred to here to show the view of the Legislative Department of the government as to the propriety of reviewing discretion of this character. While the jurisdiction and power is unquestioned in certain cases, and the means here sought to make that power operative is correct, yet it must be a plain case of wrong to induce this court to control an inferior court in the exercise of a power which is essential to the maintenance of its own dignity and the respectability of its officers.

The proceedings in this case are irregular in several respects.

First, a rule to show cause is awarded before any proper ground is laid.    It appears from the record that the judge awarded a rule to show cause why the name of the attorney should not be stricken from the roll of attorneys of the county court, "for conduct unbecoming an officer of the court, in representing himself as an attorney in a matter for the purpose of influencing the same, when in truth and in fact he was not such attorney."

It appears that A. C. Blount made oath that he believed that the matter set forth in the " above rule " was true, and hence, so far as it appears from the record, there was no ground laid for the rule before it was issued.    It is unusual for any party to swear to the truth of facts set up in the process of courts; whatever facts are alleged as the basis of its action by the court are its own deductions from what has been previously laid before it or has come within its judicial view.    In this case the court seems to have acted without either.

Second.  It does not appear that the rule was served, or that service was expressly waived, or that the rule was made return-able at any certain day.    It does appear, though, that the petitioner was present at the taking of the evidence, and was heard in his defense, and we are inclined to think that this cures this defect.    Where it is intended to apply to the court to have an attorney disbarred, the proper course of proceeding is to present the evidence relied on to the court, and it will direct a rule to show cause to be entered, if a case proper for the action of the court be presented.    This rule is served and returned, and the court hears and determines the case accord- ing to law.    *In Re* John Percy, 36 N. Y'k Repts; 22 Wendell, 656; 1st Yerg., 229.

A regular complaint against an attorney, says Chief-Justice Marshall, ought not to be received and acted on unless made on oath.    9 Wheat., 529.    It has been held by some of the courts that the charge made must be specific and particular, so that the officer may be aware of the precise nature of the charge he is to meet; and we think this is the correct rule.    3 Green's Rept's, 551.

This is a summary proceeding, involving the professional char- acter of the party, and the result of which, if adverse to him, deprives him, *pro tanto*, of the vocation from which the support of himself and his family is derived.    We have no like proceed- ings to deny a merchant the right to vend his goods or the farmer to cultivate his farm, and while it is essential that the

The State of Florida vs. William Kirke—Opinion of Court.

power of the courts should remain unimpaired in the exercise of this great and peculiar function, it is not the less so that the right of the officer should be protected. • We think that the precise " matter" in which he represented himself as an attorney falsely should have been set forth. It remains to consider the facts of this case as disclosed by the record.

From the evidence and the record it would seem that the charge was intended to be, that the attorney falsely represented to James Abercombie that he was the attorney of one B. C. Bennett, authorized to represent him in certain business matters connected with the Alabama, and Florida Railroad not yet adjusted between Abercombie and Bennett, Abercombie being the president of the Railroad Company, as well as certain other matters of business existing between them. It appears that on the 18th of August, Bennett had written to Wolfe requesting him, as one of the " city fathers " of Pensacola, to use his influence in securing the repayment to him, Bennett, of certain moneys which he had nine months before loaned. In this letter to Wolfe he writes: "I intend to start North in a few days, just as soon as I am able to travel. C. C. Coles, of this place, will be my agent during my absence. He is a gentleman and a responsible man. If you wish to communicate with me you will address B. C. Bennett, Whistler, Alabama. I will leave my papers with Mr. Coles." It appears from the record that Wolfe wrote a reply to this letter, and that Bennett received it before he left. Its contents, however, are not disclosed, except so far as they may be inferred from the following letter written by Coles, the agent of Bennett, under Bennett's instructions, on the 28th of August, 1868, which Wolfe received:

" WHISTLER, Mobile County, Ala., Aug. 28, 1868.

J. DENNIS WOLFE, ESQ.:

*Dear Sir:* Your favor of the 25th came duly to hand a few hours before Mr. Bennett left for the North. *He desires me to reply.* You will find inclosed a copy of receipts against certain

parties in your city. I would earnestly request you to give them your earliest attention, as Mr. Bennett will require all the money that he can get to pay his debts, and he expects me to receive the money from Pensacola to enable me to satisfy all demands against him. Hoping to hear from you soon I will close, and remain,

　　　　　　　Respectfully yours,　　　C. C. Coles,

　　　　　　　　　　　　　　　　　　　For B. C. Bennett."

"P. S. — In addition to the amounts inclosed, Mr. Bennett informed me that he advanced to Mess. Abercombie and Ruter the sum of four hundred and seventy-five dollars as follows: four hundred of it was paid more than a year ago, and the balance sent them from Mobile last February or March. He also said that he loaned A. C. Blount thirty dollars on the 25th day of March, 1868. You will please see the above parties; and if possible, have all the accounts settled up as soon as possible.

　　　　　　　Yours,　　　　　　　　　　　C. C. C."

In this letter was inclosed one receipt of James Abercombie, as President of the Alabama and Florida Railroad Company, to one R. M. Ruter for the sum of one hundred and seventy-five dollars, received to pay expenses connected with proceedings in bankruptcy by the Company, and which was to be returned from the assets of the Company, which receipt had been transferred by Ruter to Bennett. There were also two receipts of James Abercombie, president of the road, for sums to be applied to the case in bankruptcy and returned from its assets, one of which was for the sum of thirteen hundred dollars, the other for seventy-five dollars. There were also other receipts of Wolfe and Blount to Ruter and Bennett for moneys received, with which it would appear from the record that Abercombie had some connection. It will be noted that the authorized agent of Bennett, in this letter to Wolfe, whose business was that of a practicing attorney, instructed him as follows: "In addition to the amounts inclosed *Mr. Bennett* informed me that he advanced

to Mess. Abercombie & Ruter the sum of four hundred and seventy-five dollars." "He also said that he loaned A. C. Blount thirty dollars on the 25th. day of March, A. D. 1868. You will please see the above parties, and if possible have all the accounts settled up as soon as possible."

This is written by Mr. Bennett's agent, and is a postscript to a letter which the agent says he wrote at the "desire" of Bennett. The instruction is positive: "You will see the above parties, and if possible have *all the accounts settled up as soon as possible.*" After receiving both of these letters, and on the 17th of September, A. D. 1868, Wolfe writes to Abercombie a respectful letter in which occurs the following passage: "Mr. Bennett, whose attorney I am, desires me to say to you that he is desirous that a speedy adjustment of the matter between you and him may be made." Mr. Wolfe was a practicing attorney, and it was his business to attend to such matters in no other capacity, so far as this record discloses; and his conclusion that he was so desired to act is entirely justified by these letters. These letters show clearly what was the foundation for Wolfe's letter to Abercombie. The other evidence in the record discloses nothing that could *have influenced Wolfe's conduct* or affected his *conclusions from these letters,* and the true question which the court below should have considered was, Did these letters justify the conclusion to which Wolfe came? viz.: that he was to act as Bennett's attorney, and even had he made a mistake in his conclusion, yet if there was reasonable ground for such apprehension, the court would not have been warranted, under the circumstances, in making the judgment it did.

The evidence which was introduced to sustain the charge was a letter of Bennett to Abercombie, dated Nov. 17, 1868, in which he stated in effect that he did not constitute Wolfe his attorney in the matters referred to, "with instructions to demand of Abercombie a speedy settlement of the money transactions" he had had with him. Strictly speaking, Bennett may not have done so *in person,* but his agent, whom he described to Wolfe as " a

gentleman and a responsible man," did give these instructions substantially, in a letter written at his desire; and unless Bennett made this statement in view of this distinction, or in view of a difference in the precise words used by him and those by his agent, he either misrepresented the character of his agent or made a grave mistake himself in his letter to Abercombie. So far as the fact that these charges were preferred by a brother member of the profession is concerned, it is highly commendable, if the motive was good and there appeared to be good cause. In this case, if Bennett's letter to Abercombie was all that was seen, it would naturally create the presumption of bad conduct. It is the duty of members of the bar to institute proceedings to disbarr one that brings discredit upon the profession by highly improper conduct.

Without passing upon the question made at bar that the alleged misconduct must have been when "acting as an officer of the county court, or in some suit, matter, or proceeding therein, or in which that court had jurisdiction, we are satisfied that the case is plain upon the testimony, and comes within the rule as enunciated by Chief-Justice Marshal in Ex parte Burr., 9 Wheat., 529, which is, as we understand it, that this court can properly interpose when the county court has decided erroneously on the testimony, and its conduct is manifestly improper.

Our conclusion is, that a peremptory mandamus must issue.