GRANT, J.
Our attention having been directed to an accusation of alleged misconduct in office by Edward P. Strong, an admitted attorney at law practicing in this court, thereupon we apX>ointed a committee to proceed in tbe matter of snob accusation in such way as they might be advised.
Whereupon the managers so appointed exhibited in court a charge against the respondent, alleging, as they said, the misconduct mentioned, involving, as was alleged, moral turpitude, embodying four specifications, together with the evidence taken to substantiate the accusation.
Upon hearing and argument, specifications 1 and 3 were abandoned, and numbers 2 and 4 alone were relied on.
Specification two is of the following tenor and effect, viz:
One Smith was the so-called “business agent” of a labor organization called tbe Building Trades Council of tbe city of *82 Cleveland. A strike was called on or against the Gaylord W. Feaga Company, which Smith undertook to call off; and he demanded and received, as a consideration and condition of his service in so ending the strike — corruptly and wrongfully, as was said — the sum of $3,500. The respondent, Strong, received for himself no part of the money; but he was, and acted as, the attorney of Smith in the transaction, which was negotiated and consummated in and through his office and with his knowledge. His law office appears to have been a sort of clearing-house for the grafting operation.
Specification 4 is of a like effect, except that the sum paid was $5,000, was made to Smith and one Owens, and the payer was the Artificial Silk Mills Company.
The material facts, substantially as we have in brief form stated them, are not in dispute.
The respondent filed no written answer to the accusation exhibited against him, but was heard by counsel orally at the bar.
What he has to say, as we understand it, is that, the facts being conceded, still his conduct was not what is claimed for it by the manager's, in legal quality and effect: his defense amounts, perhaps, to what in some jurisdictions is known as a plea of noli contendere — putting the matter up to the court, to be dealt with in result.
The proceeding is prosecuted under the supposed authority of See. 1707 of the G. C., which purports to confer on this court jurisdiction to forbid the accused to practice law in all of the courts of the state, if found guilty of either misconduct in his office of an attorney, or unprofessional conduct involving moral turpitude.
In the view we have concluded to take of this case, it is not very material, we think, to find, specifically, under which of these two separate grounds the delinquency of the respondent falls. If it were thought material, my own inclination would be that the former is made out by the evidence, and not the latter.
Before proceeding to the consequent step of meting out the adequate penalty to be annexed to the repondent’s breach of duty as an officer of the courts of Ohio — including this court— *83 we have thought it fit to examine, with some care, the basis of our power to act in the matter at all, and the source and extent of the jurisdiction of this court in this proceeding. The question was not raised in argument, but it is in the case — to a considerable degree decisively — and we must deal with it accordingly.
Before the adoption o£ the amended constitution of 1912, the general assembly of Ohio had large discretionary powers to confer jurisdiction upon the courts of the state, including the predecessor of this court. But since that constitution became effective, the former legislative source of jurisdiction as to this court is cut off and wholly denied. To find what the jurisdiction of this court is, in any case, one must go behind the statutes and look to the constitution itself. If he does not find warrant for it there, conclusively it does not exist.
This is not only apparent from a reading of the amended. constitution, but that such is the construction is now expressly • settled by adjudication of the Supreme Court in Cincinnati Polyclinic v Balch, 92 Ohio St. 415 [111 N. E. 159]. It is there said:
“This amended section of the constitution does not authorize the legislature to grant any jurisdiction, original or appellate, to the courts of appeals.”
The statute, therefore, which is relied on to direct us to give judgment in this case, is altogether inert and without power to do so. That the legislature thought it might with propriety confer the jurisdiction now sought to be exercised, is of course true; for Sec. 1707, in its present form,-was enacted after the present constitution became operative, and it names courts of appeals in express terms as agencies for working a disbarment in any proper case. But it is equally true that reputable lawyers of long experience have constantly to be admonished to quit looking at statutes, and to look alone to the constitution as the source of all jurisdiction of this court, and as to how far in any case it extends. In this very proceeding a possible want of power on our part to determine the matter seems not to have occurred to the able counsel on either side; for no such infirmity is suggested.
*84 Observing this admonition ourselves, and finding in Sec. 1707 no warrant for the jurisdiction invoked here, let us, too, turn to the constitution for guidance. We shall fare no better there.
That the jurisdiction* called in function is appellate, is, of course, not claimed. We are asked to act in this proceeding strictly as a court of first instance. The grants to this court, by the constitution of original powers in this respect are specific and enumerated. They are limited to the allowing of appropriate writs necessary to exercise a superintending control over inferior jurisdictions, namely, mandamus, quo warranto, procedendo and prohibition and the great writ of habeas corpus.
We derive no power to proceed to judgment in this case from the constitution.
Clothed, then, with no authority to act from either constitution or statute, have we any by unwritten law? 'Do we have, and may we upon proper occasion assert, an inherent power, residing at all times in gremio legis, in thé breast of the court as such, and ready to come forth and administer the appropriate sanction annexed to its inherent existence?
The answer to this inquiry calls for an historical examination of the subject.
At common law, courts had no power to admit practitioners at their bars. They were called to that function by the Inns-of Court, which were mere associations or guilds; and the right seems to have depended a good deal on the number of meals eaten at commons.
It was not. so, however, in regard to control of attorneys after admission. It seems that from very early times the courts by common law exercised full jurisdiction over them, even before there was such a thing as a roll of attorneys'; for the roll was introduced by 4 Hen. IV., ch. 18; the language of the act in that respect is “that all attorneys shall be examined by the justices, and by their discretion their names shall be put upon the roll." The fourth Harry began to reign in 1399.
Before that, by the Statute of Westminster, 3 Ed. 1, ch. 29, it was provided, “that if any sergeant, counter, or other, do any matter of deceit or collusion in the King’s Court, or consent to *85 it, to deceive or entrap the court or one of the parties, he shall be no more heard in the court to plead for any one. ’ ’
It is said of this statute by Lord Coke, 2 Inst. 213, that as the prohibited practices “were against the common law, therefore this act was made in affirmance of the common law.”
Edward I came to the throne in 1272, so that the statutory affirmance of a power declared to have been already in existence at common law must have antedated the first statutory recognition of attorneys as a class by at least a century and a quarter. Anciently it existed over counsellors as well as attorneys: it is so stated in Hawkins, Pleas of the Crown, 461, and in Reeves’s History, Vol. 2, 126. And the control by the courts wherein they practiced over both was summary. Hawkins, P. C. 369. In Joseph S. Bradley, Ex parte, Justice Nelson says: “We do not doubt the power of the court to punish attorneys for misbehavior in the practice of the profession. This power has been exercised and recognized ever since the organization of courts.” And this he said in a case involving disbarment in the judgment awarded.
To say that the power existed at common law is to say that in those early times, at least, it was inherent in the court of common law. It was an asserted and not aderived jurisdiction, to be invoked and exercised as to the apprehension of the courts the occasion might call it forth.
Let us now see whether it has been continued since those times and down to our own.
We have examined many authorities to find a reasonably settled answer to this inquiry. Perhaps the most satisfactory of these in exhibiting what the present state of the law is, and its continuity in unimpaired vigor from the older days, is Danforth v. Egan, 23 S. Dak. 43 [119 N. W. 1021; 139 Am. St. Rep. 1030; 20 Ann. Cas. 418], The repondent in that case had been disbarred by judgment of the Supreme Court of his state; and, while that judgment was. still effectual, he was elected by the people prosecuting attorney for his county. His claim was, that he might in that capacity still appear and practice in the courts. Upon this state of facts the court observes as follows:
“Did the framers of the constitution intend to indirectly take from the courts, in favor of a certain excepted class of per *86 son, a right which the statutes of the territory had recognized as resting in the courts; a right recognized for centuries, by all countries and states having laws based on the English common law, as the inherent right of the court; a right necessary in the very nature of courts and the duties devolving upon them; a right which, if lost, would soon bring the courts of our land into contempt; the right to say who as attorneys shall be recognized as officers of the courts, together with the right to expel such persons whenever they have been adjudged- unworthy or unfit for this important trust? This right of the courts is as much the law of our land, and of as much dignity as such, as any law found in the constitution or statutes. It is not dependent upon either the constitution or the statutes for its existence, but exists fully in all courts of record, unless expressly restricted or taken away by express legislation; and it is a serious question whether it lies within the power of the legislature to do more than regulate this right of the court, whether the legislature can more than prescribe certain qualifications for admission, leaving to the proper court to fix others if it sees fit, and whether the legislature can more than fix certain grounds for disbarment, leaving to the court to disbar for other reasons within sound judicial discretion. 3 Am. and Eng. Ency. Law, pp. 287, 300, 301; 4Cyc., 900.”
Among the cases which sustain this view we have found the following: Goodrich, In re, 79 Ill. 148; Penobscot Bar v. Kimble, 64 Me. 140; Martin, In re, 6 Beav. 237; Trippe, Ex parte, 66 Ind. 531; Steinman, Ex parte, 95 Pa. St. 220 [4 Am. Rep. 637]; People v. Green, 7 Colo. 237 [3 Pac. Rep. 65; 49 Am. Rep. 351]; Serfass’ Case, 116 Pa. St. 455 [9 Atl. 674]; Manning v. French, 149 Mass. 391 [21 N. E. 945; 4 L. R. A. 339]; Davies, In re, 93 Pa. St. 116; State v. McClaugherty, 33 W. Va. 250 [10 S. E. 808; 6 L. R. A. 740]; Cole, Ex parte, v McCrary, 405; Wall’s Case, 107 U. S. 265 [2 S. Ct. Rep. 569; 27 L. Ed. 552].
Weeks, Attorneys at Law, 154, sums up what he conceives to be the result of the authorities on the subject, thus:
“The power to strike from the rolls is inherent in the court itself. No statute or rule is necessary to authorize the punishment in proper eases. * * * It is necessary for the protec *87 tion of the court, the proper administration of justice, the dignity and purity of the profession, and for the public good and the protection of clients. ’ ’
We conclude, upon this point, that we have jurisdiction of the subject brought before us in the proceeding, inherent in our court, and not needing the aid of any written or formal law to call it forth and set it in motion towards such mode or measure of redress or remedy as may commend itself to a fit discretion in our exercise of the power so existing.
The present constitution of Ohio, as interpreted in Polyclinc v. Balch, supra, allows the legislature to provide by law for the procedure of the courts in pursuing the jurisdiction conferred by that instrument. And, while it is to be supposed, certainly, that any court having an offended dignity to vindicate, or a morality to safeguard, may furnish its own procedure to that end, we consider the manner adopted by the managers in this proceeding to bring the matter of it to our judicial attention as altogether proper and acceptable.
Having found, so far, that we have jurisdiction, and that its exercise is adequately challenged, we are next to consider to what it extends.
Section 1707, supra, undertakes to give us the power to prohibit the respondent from practicing as an attorney in all the courts of the state; and such is the prayer of the managers. But that is upon the theory that we are to find our jurisdiction in the statute, and not in the constitution of the court, and the inherent necessity of finding it there, which we do not.
Finding, as we do, that a jurisdiction — a power to hear and determine — resides in the breast of our own court, we are asked to spread it over all courts, reaching upward to the Supreme Court and down to all inferior tribunals, for the purpose, and prescribing for them pains and penalties to be visited upon one who in their estimation may never have offended them, or invaded their own strongholds of morality and dignity. In general it may be observed that a court will do well if it undertakes to preserve its own purity against its own officers, and protect its own litigants from being plundered by its own servants; and that its embarking in a career of general uplift, scouring other *88 courts for the purpose, would be a mere impertinence, not to be attempted by the one or tolerated by the others.
The exact question was before the court in. State v. Kirke, 12 Fla. 278, in which the whole matter is luminously discussed.
The syllabus in that respect is:
‘ ‘ The county courts of this state have the power to disbar an attorney and to deny him the rights of an officer of that court, but their judgment can not extend beyond a denial of the privileges of an attorney in that court. It does not directly affect his rights in other courts. ’ ’
The power thus allowed to reside in the court was an inherent or asserted power — the same as the only power we admit this court has — and not a power created by positive law.
The same result seems to have been reached in a converse manner by the Supreme Court of the United States in Tillinghast, In re, 29 U. S. 21. In that case the applicant for ad mission to practice in that court had been disbarred by the district court of the United States in his own state (and the record so showed), as for a contempt. Nevertheless, he was admitted, Chief Justice Marshall intimating that one court should not interfere with another in that respect.
To an extent that has, as we think, considerable significance, this part of our inquiry has been dealt with by the Ohio courts. In Thatcher, In re, 83 Ohio St. 246 [93 N. E. 895; 22 Ann. Cas. 810], the respondent had entered against him a judgment which had the effect of prohibiting him from practicing as an attorney in all the court of the state. In looseness of language he was said to be “disbarred;” and so, in point of resulting fact, undoubtedly he was. But the question of the form of that judgment we shall deal with presently.
While this judgment amounting to a prohibition of Thatcher was in force, the legislature undertook to interfere by passing a statute reinstating him in practice, or to that purport. The statute amounted to an attempted legislative reversal of a Supreme Court judgment. In State v. Brough, 33 O. C. C. (15 N. S. 97), the circuit court for the Toledo district discussed the effect of the Supreme Court judgment upon him as a practitioner *89 in courts of tlie state inferior to that court. The circuit court found, as we have found, that the power of the Supreme Court to sit in judgment on Thatcher was inherent, and not derivative from an outside source; and reached the conclusion that the judgment operated to exclude him from practice in all the Ohio courts. But this operative result, outside of the Supreme Court, was allowed only because of, and was deduced from, the form the judgment ivas made to take in the entry in the journal. The not very short opinion in the ease winds up, in true Spartan brevity, with the one word “Disbarred.” But the syllabus says — followed in that respect in the record — that Thatcher’s name is “stricken from the roll” of attorneys admitted and competent to practice in the state. The circuit court remarks that there is but one such roll, and that is in the exclusive control of the Supreme Court; and adds that it, the circuit court, had no such roll. Nor have we. In the hands of the only court which did have the roll at its disposal, manifestly the effect on the attorney of striking his name from it made a private man of him, and operated to keep him outside the bar; that is, the only bar we are talking about. But a roll of attorneys is evidence of admission and of nothing else. Admission to the roll is statutory, as we have seen. The power to disbar is of common law origin and jurisdiction, as we also have seen. And, while the physical act of striking from the roll may work the effect of a disquafi cation to practice, that result is not inherent in the courts, because the mere possession of the roll, physically, is not of common law source or authority.
It would, we think, take more assurance than we have on hand for us to order Mr. Strong’s name taken from a paper which is in the sole possession of the only body which had a right to put it there in the first place, or to keep it there now. We are obligated to watch the virtue of our own court. We aspire not to guard that of others.
We are led-to conclude, therefore, that our power in the matter before us extends only to the status of the respondent in this court.
Having already intimated our opinion as to his guilt under the charge-exhibited by the managers, the only duty that re *90 mains for us to discharge is to declare the mode and measure of redress to which litigants in this court are entitled in this case.
We have no desire to comment particularly on the circumstances. What is expected of us in this respect by the prosecuting committee, if fairly reflected by their summing up at the bar, is not very condign. It was taken, stenographically, and is before us, where it has been the subject of the proper and leisurely reflection to which, from the advantages possessed by the managers, it is entitled. There is a dearth of caloric perceivable in it — no overpowering sense of public wrong to be redressed, or of offended judicial dignity to be avenged. The payment of the money by the two corporations was fully as corrupt and corrupting as was the receipt of it by Smith and Owens, and more guilty in motive than could have been the passage of it through Strong’s office. Both corporations were above the age of consent. If they, and not the bar of Cuyahoga county, were the direct and responsible accusers of Strong, we probably should have something to say at this point.
Still, as the men who for the time being have the good name of this court in our keeping, we must be mindful of that important trust, and visit upon the admitting offender against it such punishment as shall not be mistaken by others for a compliment to him, or be regarded as an apology by ourselves.
A disbarment absolute is not asked in the argument; it is only urged that a mere reprimand would be inadequate to meet the ends of justice, a conclusion with which we are in full agreement. We think it due to our court that the redress to which it is entitled is substantia] and not nominal. The record about to be made, without more, would be adequate so far as the respondent personally is concerned. But as a deterrent example is a required element in penal repression of all kinds, we must go beyond that measure.
Suspension is the favorite of courts in the administration of commutative justice in these days. Poor indeed in delinquency is the delinquent who has not to his credit at least one suspended sentence as a voucher for another.
We find, and it is the judgment of a majority of our number, that the respondent, Edward P. Strong, be suspended from office *91 as an attorney in this court, and debarred from practice as such therein, for the period of one year from the entry hereof.
Carpenter, J., concurs.