### THE STATE OF IOWA v. JAMES F. HOLLAND, Appellant.

**Disbarment Proceedings:** APPOINTING MORE THAN ONE ATTORNEY TO PROSECUTE. Under Code, section 325, providing that in a proceeding for the disbarment of an attorney, which is commenced under the direction of the court, the court must appoint some atttorney to draw up the accusation, the fact that the court appointed three attorneys to take charge of such proceedings, and to draw and file the proper accusation, instead of one, was immaterial.

ORDER TO DEFENDANT TO APPEAR: *Validity.* Code, section 326, provides that if the court deems the accusation for the disbarment of an attorney sufficient, it may make an order requiring the accused to appear. The court issued such an order before the sufficiency of an accusation was passed on, but such accusation was ordered to be filed by the court upon facts coming to its knowledge on the trial of a former case, and the accused appeared, and the sufficiency of the accusation was raised and passed on by motion and demurrer. *Held,* that a judgment of disbarment would not be reversed for a failure to pass on the accusation before the order was made.

FINDING OF GUILT: *Sufficiency in form.* Where the accusation in a disbarment proceeding charges certain facts as a conspiracy to defraud a client, and prays that accused be found guilty and be disbarred, the final order of the court that the application of plaintiff shall be granted is a sufficient finding of the guilt of the accused.

DISBARMENT FOR CRIME: *Conviction by jury not essential.* Code, section 324, authorizes the disbarment of an attorney for the

willful violation of the duties of an attorney, as provided therein. Code, section 318, provides that an attorney who is guilty of deceit or collusion, or assents thereto, with intent to deceive a party to an action, may be disbarred. *Held*, that an attorney may be disbarred for entering a conspiracy to defraud a client, though he has not been convicted of a crime or misdeameanor in relation thereto by verdict of a jury.

EVIDENCE TO SUSTAIN DISBARMENT. The defendant in disbarment proceedings had assisted A., who was also an attorney, in the defense of a divorce case, and knew that the latter had received $3,997.50 from the client in order to prevent the plaintiff in divorce, from obtaining alimony. The client testified on the trial of the divorce case that he had lost the money. After the trial, A. refused to pay the client anything, except $40 to enable him to leave town, and intimated that he might be prosecuted for perjury. Defendant then approached the client and obtained a contract to collect the money from A.; and together they returned to the office of the latter and induced a settlement for $250, and the client gave a receipt in full. On the same day A. gave defendant a check for $250, which the latter swore was for services not connected with such case, but on the same day he delivered an affidavit to A., to the effect that the settlement with the client was freely and voluntarily made. He also gave a written statement to A. that nothing unusual had taken place at the settlement, but on the trial he testified that A. threatened the client with prosecution for perjury, and that the defendant advised him that he had better lose the money than to go to the penitentiary. *Held*, sufficient to sustain a judgment of disbarment.

Pleading: STRIKING OUT AMENDMENT. It is not error for the court to strike out an amendment to the accusation during the trial of disbarment proceedings, when such amendment is only an allegation of evidential facts which might be proven under the original accusation.

*Appeal from Hamilton District Court.*—HON. J. R. WHITAKER, Judge.

FRIDAY, OCTOBER 19, 1900.

AT the March term, 1899, of said court, Hon. S. M. Weaver, presiding, made an order reciting that it appeared

from the testimony and record in the case of George Barber against George C. Olmstead, tried and determined at that term, "that there is reasonable ground for proceedings to revoke and suspend license of James F. Howard to practice law in the courts of this state," and it was ordered that such proceedings be instituted. It was further ordered "that N. B. Hyatt, A. N. Boeye, and Wesley Martin, practicing attorneys of this county, be directed to take charge of said proceedings, draw up and file the proper accusation, and serve copy of same on said Howared at least ten days prior to the first day of the next term of this court, and to do all other things necessary and proper to a hearing and trial of said charges upon their merits." In pursuance of said order said attorneys filed and served charges and specifications against James F. Howard, in effect accusing him with having conspired with George C. Olmstead, also an attorney of said court, to cheat and defraud one George Barber. The defendant's motion to strike said petition and his demurrer thereto being overruled, he filed his denial of the alleged conspiracy, and a motion to dismiss on the grounds that he is charged with a crime, and that the court cannot disbar him on the charge, or take any evidence relating thereto, until he has been convicted of the crime charged, by a jury. This motion was overruled, and a trial had upon the issues, joined by a denial of the alleged conspiracy; and it was adjudged and decreed that the license of the defendant be revoked and suspended for a term of two years from August 7, 1899. Defendant appeals.—*Affirmed.*

*William Asher Howard* for appellant.

*N. B. Hyatt, A. N. Boeye,* and *Wesley Martin* for the State.

GIVEN, J.—I.  A brief outline of the facts will aid in understanding the questions to be considered.  James F.

Howard, then a young man, was admitted to the bar in
1896, and commenced the practice of law in Webster City
in and near which place he had lived for many years, and
where he was held in high esteem as an honorable man.
For some time he occupied the same office with George C.
Olmstead, then county attorney, and, although not in part-
nership, he occasionally assisted Olmstead in his professional
work.   One George Barber retained Olmstead as his attor-
ney to defend an action by Mrs. Barber for divorce
and alimony.   Barber converted some notes he had
into cash, realizing $3,997.50 therefor, which he
placed in the hands of Olmstead, to put it beyond the reach
of Mrs. Barber on any judgment she might recover for the
alimony.   Olmstead paid Barber small amounts from time
to time, which, with his charges for services, about covered
the excess over $3,000 of the money which Barber gave him.
When Olmstead received the money he took a time certifi-
cate of deposit, due in one year, in his own name, for
$3,000, and the balance he had credited on his own account.
Howard, at the instance of Olmstead, aided in the prepara-
tion and trial of the divorce case; and, although he may not
have known what disposition Olmstead made of the money,
he undoubtedly knew of its receipt by Olmstead, and the
purpose thereof.   On the trial of the divorce case, Barber
testified that he had been robbed of his money while in Chi-
cago—a statement that both Olmstead and this defendant
knew to be false.   There is no evidence that the defendant
advised or consented to Barber's giving this false testimony,
and, being only an assistant in the case, it may be that he
was powerless to prevent it; but not so with Olmstead, who,
no doubt, advised it.   At the time the $3,000 certificate be-
came due, Barber came to Webster City, and demanded his
money of Olmstead, who denied that he was owing him
anything, intimated that he might be prosecuted for per-
jury, and paid him $40 to enable him to leave the town.
Olmstead solicited the defendant to assist him in scaring

Barber away, and offered to pay him $50 to do so, but defendant testifies that he refused to do so, and went to the depot, where Barber was about to leave, and induced him to return, promising that he would assist him in getting more money out of Olmstead. Barber and the defendant then agreed that defendant should act for Barber, and that he should have one-half of whatever they got from Olmstead. They returned and pressed Olmstead for further payment, and the result was that Olmstead paid Barber $250, of which defendant got $50. Barber wrote and signed a receipt to Olmstead for $3,180, to which Olmstead required the words "in full of all demands up to date" to be added, which was done, and Barber then left the city. Afterwards, on the same day, Olmstead gave his check to the defendant for $250, which defendant testifies was on a settlement between them for office rent and services rendered by defendant to Olmstead in typewriting, etc., and that Olmstead refused to settle with him until after Barber had gone. On the same day (May 11, 1898) the defendant signed and delivered to Olmstead his affidavit, executed before R. W. Biggs, notary public, as follows:

"Affidavit. I, James F. Howard, being first duly sworn, do depose and say that I was attorney for George Barber on the eleventh day of May, A. D. 1889, in a settlement of all accounts and demands of whatever kind or nature between G. C. Olmstead and George Barber, and especially including $3,000 borrowed money; that, up to and on the above date, George Barber received the sum of $3,180 in money and services from said George C. Olmstead, and receipted to him for the same on said day, in full of all demands, of whatever kind and nature, existing between said George Barber and G. C. Olmstead on said date; that said settlement was made at the office of G. C. Olmstead, and there having been a dispute and other items of account between G. C. Olmstead and George Barber, and the amount due George Barber being in dispute, the said amount of

$3,180 was voluntarily and freely agreed upon as the amount due, amount paid in money, and services up to this time, to said George Barber; that said settlement was freely and voluntarily made on both sides.  [Signed]   James F. Howard.

"Subscribed and sworn to before me this eleventh day of May, 1898, by James F. Howard.  R. W. Biggs, Notary Public in and for Hamilton County, Iowa."

Concerning this affidavit the defendant testifies as follows:  "He said he was going to Oklahoma, to run for county attorney down there, and that Barber had gone away, and neither of us would ever see him again, and, if he was going to support me and get support for me here as county attorney, I ought to help him out down there, and he wanted a statement showing that he had done the square thing with Barber.  He wanted it in the form of an affidavit, and said that Biggs would put his seal on it without swearing me to it, or without knowing what was in it, or anything of the kind, and it would be just a confidential matter between him and me, and he would never show it to any one in the state.  I asked what he wanted in the statement, and he said he just wanted it to show that he had paid Barber up, and that, if they sprung anything in politics down in Oklahoma, he wanted it to show that he had done the square thing up here.  I told him I didn't want to give anything of the kind, and that I wouldn't swear to anything of the kind at all, and he said I wouldn't have to. I finally consented to give it to him, and he went up to my office, and he dictated what he wanted, and I wrote it down in pencil, and then on the typewriter.  I started to write it on the typewriter, and got down to the place where I saw very plainly that the affidavit would conflict with itself, and I said: 'What is the use of making this for $3,180, all you owed him, and then stating that the settlement was free, fair, and voluntary?'  I said: 'It is inconsistent. Nobody could read it without knowing it was a lie here, any-

way.' 'Now,' I said, 'if you say $250, and then say the settlement was free, fair, and voluntary, it would be consistent with itself, anyway.' He said he wanted it just as he had dictated it to me. I told him that I wouldn't give it to him; that anybody that would read it would know that it wasn't so. He renewed his promise not to show it to anybody in this state, and said that Biggs wouldn't know what it was, and that, under any consideration, he wouldn't show it to anybody here. 'Well,' I said, 'Biggs will know what is in it, anyway.' Biggs was the notary public that I was going before to have him put his seal on it. 'No,' he said, 'he won't'—not to let Biggs read it at all. So I finished up the affidavit part of it, and took it out of the typewriter, and rolled it around on the back side to put the jurat on, so Biggs couldn't see it,—so he couldn't read the affidavit. Olmstead said, 'What are you doing that for?' I said, 'So Biggs won't see it.' He said it was no good that way. He says, 'You won't have to swear to it, and you won't have to show it to anybody, and it is just a confidential matter, and I will see that nobody sees it.' I told him if Biggs put his seal on it without swearing me, I would give it to him, and if he didn't I wouldn't. I went down to Biggs' office, and Olmstead was up to his office,—Mr. Biggs wasn't there, and on the way back stopped at Olmstead's and told him that Biggs wasn't in, and that I would go down in an hour or so, and have him put his seal on it. He says, 'Go down and have Counts put his seal on,' and I says, 'I wouldn't trust Counts for anything.' I started out of the office, and he says, 'Wait a minute,' and he pulled out his check book from his pocket, and I says, 'Never mind. I will get that when I come back.' (This $250 check that had been written out before that.) I went down in about half an hour and asked Biggs to put his seal on it, and he did. I took it and went back to Olmstead's office. Mr. Biggs didn't swear me to it, and I didn't sign it in his presence. I took it back and gave it to Olmstead. If Mr.

Biggs had sworn me to it, I wouldn't have given it to Olm-
stead." Afterwards the defendant gave Olmstead a state-
ment in writing saying, among other things, that "there was
nothing unusual took place at the settlement." On the trial
of the case of Barber against Olmstead this defendant tes-
tified that before the settlement Olmstead threatened to
prosecute Barber for perjury, and that he advised Barber
that he had better lose his money than run the risk of going
to the penitentiary.

II.   Section 325 of the Code provides that in proceed-
ings like this, commenced by the direction of the court, the
court must direct some attorney to draw up the accusation.
Defendant complains that three attorneys were "di-
rected to take charge of said proceedings, draw and
file the proper accusation," etc.   Surely it was im-
material to the defendant whether the accusation was drawn
by one or more attorneys.   The contention is without merit.
The claim that the accusation is not sufficiently specific is
equally without merit.   It plainly charges the defendant
with conspiracy with Olmstead to cheat Barber.

III.   Code, section 324, provides: "The following
are sufficient causes for revocation or suspension: (1) When
he has been convicted of a felony, or of a misdemeanor in-
volving moral turpitude; in either of which cases the record
of conviction is conclusive evidence. (2) When he is guilty
of a willful disobedience or violation of an order of the
court requiring him to do or forbear an act connected with
or in the course of his profession. (3) A willful violation
of any of the duties of an attorney or counselor as herein-
before prescribed. (4) Doing of any other act to which
such a consequence is by law attached."   Appellant
contends that these causes are to the exclusion of all
others, that he is charged with a crime under the
first clause, and that his license cannot be revoked or sus-
pended until after conviction.   There is some conflict in the
cases on these questions, but, in the view we take of this

case, we are not called upon to consider them. Turning to section 318 of the Code, we see that it was "hereinbefore prescribed" as follows (section 318): "An attorney and counselor who is guilty of deceit or collusion, or consents thereto, with intent to deceive a court or judge or a party to an action or proceeding, is liable to be disbarred, and shall forfeit to the injured party treble damages to be recovered in a civil action." The charge is clearly within these provisions.

IV. Appellant complains that the court did not pass upon the sufficiency of the accusation before entering an order requiring him to appear. The cause for ordering this proceeding came to the knowledge of the court in the trial of Barber against Olmstead, and thereupon the court appointed three attorneys to prepare and serve the accusation, which was done. The defendant appeared to it, and its sufficiency was passed upon by the rulings on his motions and demurrer. Section 326 of the Code provides that, if the court deems the accusation sufficient, an order shall be entered requiring the accused to appear. There was no possible prejudice to the appellant by the order in which this proceeding was commenced. He also contends that the final order of the court is insufficient, in that it does not find him guilty of the charges. The charge is of certain facts which show conspiracy, and the prayer, that the accused be found guilty and disbarred. The court found "that the application of the plaintiff, through the commission formerly appointed by the court, should be granted." There being but one charge, it is clear from the record that defendant was found guilty of that charge.

V. Appellant's remaining contention is that the evidence fails to sustain the charge. We fully concur with the cases cited to the effect that judgment of disbarment should only be pronounced upon clear and convincing proof, and that when the evidence is conflicting the attorney should not be disbarred, "where the evi-

dence shows that for many years the defendant has borne a good reputation." See *State v. Cowing,* 26 Or. 572 (38 Pac. Rep. 1090); *People v. Pendleton Co.* Colo. Sup. (30 Pac. Rep. 1041); *In re Catron.* 8 N. M. 253 (43 Pac. Rep. 724). Appellant insists that he did not become an attorney for Barber until the agreement made just prior to the time they together demanded more money of Olmstead, that he refused to act for Olmstead in getting Barber away, and that after his employment by Barber he did all he could to get the largest possible sum for Barber. Barber substantially corroborates the defendant as to these matters, and he evidently believes that defendant acted in good faith and honestly towards him, but he so believes because he had no knowledge of any conspiracy between Olmstead and the defendant. The defendant knew how and why Olmstead came into possession of the money, and of his purpose to cheat Barber. He knew of the perjury Barber had committed, and of Olmstead's purpose to use the fear of prosecution to terrify Barber out of the county. He knew that Barber had received $40 and was about to leave town, but he also knew that he might return, and that as yet Olmstead had nothing to show a settlement or payment. If nothing further appeared, we might conclude that the defendant acted in good faith in following Barber and inducing him to return, but we have the fact that defendant and Olmstead together watched to see that Barber did leave and when he was gone defendant signed and gave Olmstead his affidavit, and Olmstead gave him a check for $250. Defendant says he never in fact swore to the affidavit; yet he gave it to Olmstead, duly signed, certified, and sealed, as evidence with which to show that the settlement with Barber was "freely and voluntarily made," when he knew that it was made by Barber under threat and fear of prosecution. The check, he says, was in settlement of a claim he had against Olmstead. Rather strange that this claim that matured months before should be settled immediately after

Barber's receipt in full to Olmstead had been obtained, and Barber had left the county. We will not discuss the evidence further. It is sufficient to say that it fully sustains the findings of the court.

VI. During the introduction of evidence on behalf of the defendant, the plaintiff filed an amendment to the accusation, setting up additional acts committed by the defendant, which amendment was stricken on defendant's motion; and from this ruling the plaintiff appeals. Conceding that the right to amend existed in such cases as this and that plaintiff may appeal under this record,—questions which we do not determine,—yet there was no error in the ruling. The additional facts alleged were all provable in support of the charge of conspiracy. Therefore there was no call for the amendment, and no error in striking it. It follows from the conclusions announced that the judgment of the district court is affirmed on both appeals.—AFFIRMED.

GRANGER, C. J., not sitting.