THE STATE OF IOWA v. L. L. MOSHER, Appellant.

**Attorneys:** DISBARMENT: PROCEDURE. Code section 326 relating to disbarment proceedings contemplates an examination of the accusation by the court and a finding as to its sufficiency before the accused is ordered to answer; but where the order to answer is previously made and defendant tests the sufficiency of the accusation by motion or otherwise, the irregularity is waived.

**Same.** The order appointing attorneys to draw an accusation in disbarment proceedings need not contain a recital of facts upon which the prosecution is to be based, but the attorneys may include therein such matters as they deem proper.

**Disbarment proceedings:** JURISDICTION. The enactment of Code section 309 giving to the Supreme Court exclusive authority to license persons .to practice law, did not operate to repeal by implication Code section 323 authorizing any court of record to revoke or suspend such license, but the district court still retains jurisdiction to try and determine disbarment proceedings.

**Depositions:** NOTICE. Code section 4688 authorizes the court, when witnesses whose attendance has been anticipated are prevented from being present, to direct on motion that their testimony be taken by deposition at such time as the court may fix, and no further notice of taking the deposition is required.

**Depositions in disbarment proceeding.** A disbarment proceeding is not criminal in its nature but a special civil proceeding, and a defendant is not necessarily entitled to be confronted in court by the witnesses but evidence may be offered in the form of depositions.

**Evidence:** PRESERVATION OF SAME. Where the evidence is taken in shorthand, certified by the judge and reporter, filed with the clerk, and pursuant to an order then entered is transcribed and the transcript filed with the clerk within a reasonable time, there is a compliance with the statute requiring all evidence to be reduced to writing, filed, and preserved.

**Appeal:** TRIAL DE NOVO. Special proceedings are generally triable on errors in the appellate court, but disbarment proceedings are triable de novo.

**Denial of accusation:** EFFECT OF. Sworn denial of the accusation in a disbarment proceeding does not require a dismissal of the action thus leaving the defendant to meet a prosecution for perjury, but raises an issue for determination by the court.

**Disbarment:** EVIDENCE. In a proceeding to revoke defendant's license to practice law, the evidence is reviewed and held to warrant a judgment of revocation.

**Disbarment:** MORAL CHARACTER. The license to practice law of one who ceases to be of good moral character, may be revoked for that reason although it may not be one of the statutory grounds of revocation; but the moral delinquencies must be such as to unfit the person accused for a proper discharge of

the trust reposed in him, among which are a want of common honesty, especially in professional intercourse.

*Appeal from Warren District Court.*—HON. EDMUND NICHOLS, Judge.

WEDNESDAY, APRIL 5, 1905.

PROCEEDINGS to revoke the license of L. L. Mosher as an attorney-at-law. Four of the nine specifications contained in the accusation were held to be sustained, and judgment of revocation entered. He appeals.—*Affirmed.*

*H. McNeil, W. F. Powell,* and *Bowen, Brockett & Weldy,* for appellant.

*W. H. Berry* and *O. C. Brown,* for the State.

LADD, J.— The grand jury called the court's attention to the minutes of certain testimony given before that body concerning a transaction between defendant and one Mrs.

1. ATTORNEYS: disbarment; procedure.

Hardin, and the latter's affidavit relating thereto was also presented. The disclosures were such that the court immediately entered an order designating three members of the local bar to " draw up and file in the name of the state of Iowa the proper accusation against said L. L. Mosher at least ten days before the first day of the next term of court." As a part of the same order, he was required to appear and answer on said first day of the next term. This was irregular, for section 326 of the Code contemplates an examination of the accusation by the court, and a finding as to its sufficiency, before the accused is ordered to answer. Statutes of this character, however, are uniformly held to be directory, and as the defendant tested the sufficiency of the accusation by motion and demurrer, and thereafter answered, the irregularity was without prejudice. *State v. Howard,* 112 Iowa, 256.

II. Exception was taken to the order appointing attorneys to prepare the accusation in that it contained no recital of facts upon which the prosecution should be founded.

2. SAME.

This was unnecessary. Section 324 of the Code enumerates the grounds of revoking or suspending the license of an attorney, and section 325 declares that proceedings " may be commenced by the direction of the court," in which event " the court must direct some attorney to draw up the accusation." The statute does not specify that anything else shall be included in the order, and the inference clearly deducible is that the attorney, in preparing the accusation, may include any matter he may deem appropriate, and is not limited to anything the court may have in mind in directing that proceedings be commenced.

III. Appellant, by appropriate motions, challenged the jurisdiction of the district court to entertain the proceeding or enter any order therein. Counsel's thought is that, as

3. DISBARMENT
PROCEEDINGS:
jurisdiction.

this court alone may admit applicants to practice as attorneys at law, it necessarily possesses the exclusive inherent power to revoke such licenses after being issued. Section 323 of the Code provides that " any court of record may revoke or suspend the license of an attorney or counsellor at law to practice therein, and a revocation or suspension operates to the same extent in the courts of all other counties." This was copied from the Code of 1873, and is substantially like corresponding sections of the Codes of 1860 and 1851. Prior to an act of the Twentieth General Assembly district courts admitted to the bar upon examination and this court on motion. That act vested in this court the exclusive authority " to admit persons to practice as attorneys in the courts of this State or any of them." Section 309, Code. This cannot be held to repeal by implication section 323 of the Code, as contended, for there is not, of necessity, any connection between the two; and, moreover, the Legislature would not have been

likely to prescribe the procedure for revoking licenses without designating the forum. If anything were to be inferred, it would be an intention to amend so as to deprive courts of record other than this of jurisdiction. But such an inference is not permissible. *Diver v. Keokuk Savings Bank* 126 Iowa, 691. The law does not favor repeals by implication, and never where the later statute may be so construed as to avoid any inconsistency with that of an earlier date. The manifest purpose was to devolve upon this court the duty, as well as the responsibility, of passing upon the qualifications of candidates for admission to the bar, and not to change the practice with reference to revocation or suspension of licenses for subsequent misconduct. At the common law, courts could not admit attorneys to practice. Every litigant was bound to appear in person. Only those might be represented by attorney who had permission of the King. The custom was for him to issue a writ to the judges commanding them to receive named persons by their attorneys, and the judges obeyed. Thereafter barristers and counsellors at law were called to the bar by the Inns of Court, whose discretion in the matter of who should be called was not subject to the control of the court. The power of the court to pass upon the qualifications of candidates for admission as solicitors was first conferred upon the judges in 1292 by Edward I, and has been regulated from time to time by statute. Thus 4 Henry IV, chapter 18, provided, among other things, "that all attorneys should be examined by the justices and by their discretion their names shall be put upon the roll." See *In re Day*, 181 Ill. 73 (54 N. E. 646, 50 L. R. A. 519). But the power to punish, as well as to prohibit from practicing, has always been regarded as incident to the existence of courts, and was exercised long before attorneys were recognized as a class or as belonging to a distinct profession, though subsequently regulated by the acts of Parliament. Says Justice Nelson in *Ex parte Bradley*, 7 Wall. 364 (19 L. Ed. 214), "This power has been

exercised and recognized ever since the organization of courts." See *State v. Kirke,* 12 Fla. 278 (95 Am. Dec. 315); In the *Matter of the Application of Cooper,* 22 N. Y. 81.

The power to punish or exclude from practice, then, has always been regarded as inherent in the court, while that to pass upon the qualifications to practice at the bar has seemed to have had its origin in legislative enactments. Neither one has ever been thought necessarily to depend upon the other. The doctrine sometimes advanced that the courts are not bound by statutes defining what qualifications candidates for admission as attorneys shall possess necessarily rests on the thought that the determination of who shall act as officers of the court is incident to the efficient discharge of their independent functions as an integral part of free government. See *In re Day, supra; Matter of Goodell,* 39 Wis. 232 (20 Am. Rep. 42); *In re Mosness,* 39 Wis. 509 (20 Am. Rep. 55); *Petition of Splane,* 123 Pa. 527 (16 Atl. 481); article in 13 Harvard Law Review, 233. See, also, *Matter of Application of Cooper, supra; Ex parte Garland,* 4 Wall. 333, 379 (18 L. Ed. 366); *Ex parte Yale,* 24 Cal. 241 (85 Am. Dec. 62). Whether this is sound is not pertinent to the present inquiry. That courts admitting to practice possess, in the absence of statutes, the inherent power to disbar, is well established. *Scott v. State,* 86 Tex. 321 (24 S. W. 789); *State v. Richtor,* 49 La. Ann. 1015 (22 South, 195). But from this it does not follow that none other may be authorized to do so. Formerly each court might punish or disbar for itself, but its judgment was not effective in any other court. *State v. Kirke, supra; Ex parte Bradley, supra; Ex parte Tillinghast,* 4 Pet. 108 (7 L. Ed. 798). This was remedied in England by 22 and 24 Vict. (1860), chapter 127, section 25, and by the statute of this state declaring such judgments effective "in the courts of all other counties." This merely gives to such an adjudication the same force and effect as that in any other litigation.

It declares that persons found by one court unfit to continue in the profession shall be excluded by all other courts, and is a legitimate exercise of the police power for the protection of the public against the evil consequences of such persons continuing in the profession. As said, there is of necessity no connection between the power to admit to practice and the power to disbar for subsequent misconduct, and we know of no reason for denying the authority of the General Assembly to confer on trial courts of record the power to suspend or disbar. This does not include courts of criminal jurisdiction only, as contended by appellant, for this is not a criminal action. *State v. Clarke,* 46 Iowa, 155; *State v. Laughlin,* 73 Mo. 443. As said, independent of statute each court might have exercised its inherent power of punishing and removing its officers, and the effect of the legislation cited was merely to recognize and confirm the power which previously existed. Whether this might have been denied to either court is a different question. As directly in point, see *In re Waugh,* 32 Wash. 50 (72 Pac. 710); *State v. Kirke,* 12 Fla. 278 (95 Am. Dec. 315); and *In re Freerks,* 11 N. D. 120 (90 N. W. 265, 273), where the practice of instituting such proceedings in the appellate instead of the *nisi prius* court is disapproved. The trial court without doubt had jurisdiction.

IV. James and Isabell Hardin were unable to attend the trial, and upon written motion the court entered an order January 14, 1904, that their deposition be taken on oral interrogatories on the 18th day of the same month. Defendant had no notice other than that with which he was charged by being a party to the proceedings and present when the order was made. This was in pursuance of section 4688 of the Code, declaring that no party shall be required to take depositions on notice " during a term of court in which the action is pending, unless such court, upon written motion, in furtherance of justice, shall so order." Contrary to appellant's

*4. DEPOSITIONS: notice.*

contention, no other notice was necessary. Less time than would be permissible under the statute may be as essential in the furtherance of justice as the taking of the deposition. The statute is broad enough to permit the court, when witnesses whose attendance has been anticipated are prevented from being present, rather than postpone the trial at great inconvenience or expense, to direct that their testimony be taken by deposition at such reasonable time as the court may fix; and as such order is made on motion, no other notice is necessary.

V. When it was proposed to read the depositions so taken in evidence, objection was made on the ground that the accused was entitled to be confronted in court by the witnesses against him. Were this a criminal action, the point might be well taken. But the proceeding is civil, and within the class designated special proceedings in the Code. *State v. Clark,* 46 Iowa, 155; *Bar Ass'n v. Randel,* 158 N. Y. 219 (52 N. E. 1109); *Re Evans,* 22 Utah, 366 (62 Pac. 913, 53 L. R. A. 952, 83 Am. St. Rep. 794). The object of the proceeding is not punishment of the delinquent, but the " protection of the court, the proper administration of justice, the dignity and purity of the profession, the public good, and the protection of clients." *State v. Finn,* 32 Or. 519 (52 Pac. 756); *Ex parte Wall,* 107 U. S. 273 (27 L. Ed. 556). The use of depositions in a civil action or other civil proceeding is expressly authorized by statute (section 4684 *et seq., Code),* and there is no ground for making an exception of disbarment proceedings. The decision in the *Matter of an Attorney,* 83 N. Y. 164, relied on by appellant, was put on the ground that the statutes of that State did not authorize the taking of depositions in special proceedings. *In re Simpson,* 9 N. D. 379 (83 N. W. 541), is not in point, for the court merely held that certain affidavits were not admissible in evidence. Nor are the decisions of what was really before the courts *In re Duncan,* 64 S. C. 461 (42 S. E. 433), and

5. DEPOSITIONS IN DISBARMENT PROCEEDINGS.

*State v. Finley,* 30 Fla. 331 (11 South. 674, 18 L. R. A. 401). In the former the evidence taken in the trial of the cause, out of which the disbarment proceedings arose, was offered, and in approving the ruling by which it was rejected the court commented on the desirability of the judge hearing the witnesses. In the latter an order referring the case to a special master to take testimony was disapproved, but the error was held to have been waived. The decision in the New York case seems to have been misapprehended, and the necessity of confronting the accused face to face by witnesses to have been stated on the assumption that the proceeding is criminal in its nature. On this point all said in either case was *dicta*. As previously stated, this is not a criminal prosecution, and the requirement of the Constitution that the accused be confronted by the witnesses against him has no application. As directly in point, see *In re Wellcome,* 23 Mont. 260 (58 Pac. 711). The depositions were rightly received in evidence.

VI. The evidence was taken down in shorthand, and upon the conclusion of the trial March 5, 1904, certified by the judge and reporter, filed with the clerk, and, in pursu-

6. EVIDENCE: preservation of same.

ance of an order then entered, was transcribed, and the transcript, duly certified, also filed with the clerk June 22, 1904. This was a sufficient compliance with the statute requiring all the evidence to be reduced to writing, filed, and preserved. *Goetz v. Stutsman,* 73 Iowa, 695.

VII. Special proceedings are generally triable on errors, but the statute makes an exception in the case of disbarment proceedings. The only object in directing the preservation of the evidence, and on appeal having

7. APPEAL: trial de novo.

" all the original papers with the transcript of the record " transferred to the Supreme Court " to be there considered and fully acted upon," as required by section 329 of the Code, is to enable this court to hear the case *de novo. In re Crum,* 7 N. D. 316 (75 N. W. 257).

Appellant also insists that upon his sworn denial the proceedings should have been dismissed, and the accused left to meet a prosecution for perjury. This might result in adequate punishment, but it would not rid the profession of an unworthy member, and that is the sole object in this proceeding. Had he confessed, judgment might have been rendered instanter. Had he explained, the court would have been called upon to pass upon the sufficiency of his explanation. But, as he denied, an issue was raised for the determination of the court. *In re Eldridge,* 82 N. Y. 161 (37 Am. Rep. 558).

8. DENIAL OF AC-
CUSATION: ef-
fect of.

VIII. The complaint, with amendments, contains nine specifications, five of which were dismissed. The defendant was found guilty under each of the remaining four, and now challenges the sufficiency of the evidence to sustain the findings. The first two may be considered together. One Isabell Hardin had been appointed guardian of two grandchildren, Eric and Russell Blake, and had in her possession $1,000 belonging to them. This was known to defendant, for he had acted as her attorney in procuring the appointment, and also in releasing the mortgage through which the money was obtained. He undertook to loan this money for her as guardian, and whether through her solicitation or his is immaterial. The loan was made to A. C. and L. F. Field in June, 1901, and secured by a mortgage on fifty-three acres of land, of which about fifteen acres were under cultivation and the remainder covered with brush and small trees grown up after the removal of white oak timber. The house, which had been constructed of native timber fifty years previous, was in a dilapidated condition, and the stable was of slabs. The estimates of the value of the land, as given by the witnesses, vary from $13 to $30 per acre. Those who appear best qualified to judge place it at less than $20 per acre, and from a comparison of the opinions and opportunities to know we are convinced that the tract did not exceed in value

9. DISBARMENT:
evidence.

the face of the mortgage. Nor was the title perfect in the
Fields. A tax deed had been issued to one Brown April 22,
1898, of an undivided half of the land. On December 30
the same year another tax deed of the undivided half of
four and one-half acres of the thirteen acres and an undi-
vided half of an undivided half of the forty acres was issued
to Brown; and July 14, 1899, a third tax deed had issued
to the same person, conveying the thirteen acres and an
undivided one-half of the forty acres, though the last was
not recorded until January 29, 1902. On the 2d day of
January, 1899, Brown quitclaimed his interest in the land
to the accused, but the deed was not recorded until January
29, 1902. The defendant executed a quitclaim to L. F.
Field July 17, 1901, which was never delivered, save by
recording. Subsequently, on the 30th day of June, 1902,
Brown procured still another tax deed, and caused it to be
recorded.

The evidence farther shows that the defendant had been
dealing with the Fields for a long time, and that in June,
1892, they had executed to him a note of $1,424.40, and
secured it by a chattel mortgage on their personal property
and by a real estate mortgage on the land in question.
Thereafter they had paid neither interest nor taxes, and
previous to the loan for Mrs. Hardin had informed him that
they would abandon the farm. In 1901 they were " exe-
cution proof," so that in placing the loan the defendant
know (1) that it was doubtful if the land equaled its face
value; (2) that the Fields did not have title to over one-
half the land; (3) that they would not be likely to think of
or make any effort to pay the loan or interest or to keep up
the taxes on the land; (4) that they were not financially
responsible; (5) that they were about to abandon the prem-
ises on which the security was given; and (6) that the loan
was in his interest, rather than in that of Fields. He re-
tained the money, and, upon satisfying the mortgage exe-
cuted by the Fields to him, took another mortgage of $600

from them to his wife, subject to that of Mrs. Hardin, and
this he exchanged to one Bilboa for a small house and lot
in Indianola. The bare statement of the facts convicts the
accused of having overreached both the guardian and Bilboa,
and the only serious question is whether he accomplished
this through dishonesty and fraud.

Neither the guardian nor her husband had ever seen
the land. The accused knew this. They were uneducated,
and had little, if any, knowledge of titles. He also knew
this, and, as he had been engaged in the practice for nearly
twenty years, he must also have known that the court, if
advised, would never approve a loan such as he was having
the guardian make. Bearing these matters in mind, little
difficulty is experienced in reaching the conclusion that either
by misrepresenting or concealing the facts he deliberately
took advantage of the guardian. As to whether he informed
Hardin something of the condition of the land need not be
determined. He certainly concealed the fact that the Fields
never intended to pay the principal or interest, and would
soon abandon the premises, and we think he represented that
the land was worth $35 or $40 per acre, and that the security
would be good. He may have spoken of the title to Hardin,
but not in such a way as to indicate that it was not in the
name of the pretended borrowers. It is doubtful if he said
anything, as he was then in a situation, as he supposed, to
perfect the title. His delay before doing so in part, and in
not sending the mortgage to the guardian for over a year,
is not satisfactorily explained by merely saying that he was
waiting until he might go to the county seat of Clark county.
A better explanation is found in his offer upon Fields' fail-
ure to pay interest to purchase the mortgage of the guardian
at 50 cents on the dollar, as was testified by her and two
others, though denied by him, in which he was somewhat
corroborated by his wife. As neither the guardian nor her
husband had seen the land, or knew anything of the title,
his claim that they acted upon their own judgment is pre-

posterous. He could not well have avoided understanding that they were relying upon him, and he must have known that, had he told them the truth, they would not have considered making the loan. By his deception either through false representation or concealment he induced the guardian to part with her money, which he put in his own pocket. That she subsequently acquired the land, and, after incurring an expense of $150 in perfecting the title, sold it for $700, is no mitigation. Much that has been said of concealing the facts applies to the transaction between defendant and Bilboa, though with the difference that he had not been employed by the latter. At the time of the exchange Bilboa was seventy-seven years old, and the evidence as to whether defendant represented to him that the $600 mortgage covered sixty acres of land near a county seat, worth $60 per acre, is in dispute. The accused certainly knew, although he denied this, that the paper he was exchanging for the house and lot was practically worthless. The contract between them contains this suspicious clause: " It is understood that the representation as to the property and note and mortgage and all inducements in way of this exchange are set forth in this contract." Honest men do not ordinarily find it necessary to guard their interests by such provisions. The effect of the deal was to cheat this aged man out of his property, and though the determination of defendant's guilt rests largely upon the relative credibility of the two as witnesses, we are inclined to concur in the finding of the district judge before whom their testimony was given.

IX. It appears that the accused, as attorney for Sarah J. Cocke, obtained a judgment for $136.53 and costs against one Onie Carter August 31, 1893, which became a lien on the latter's interest in a certain lot and forty acres of land, of which her father, W. J. Moorman, was seised at the time of his death in November of the same year. On the 1st day of December following, Onie Carter and husband executed a mortgage on her interest in the estate to the wife

of the accused as security of an indebtedness of $331.64. In February, 1894, the defendant, as attorney for Onie Carter, instituted a suit for the partition of the above land. At the same time he represented Mrs. Cocke in the matter of her judgment against Onie Carter and his wife in the collection of her mortgage. Without any suggestion concerning these incumbrances, referees were appointed, and the property was ordered to be sold. Sale was made, and on April 30, 1894, the accused prepared the referee's report of the sale, in which they asked that the mortgage of Mrs. Mosher be ordered first paid out of the share of Onie Carter, and whatever remained be applied on the judgment of Mrs. Cocke. No data or reason for this was stated in the report. This was never explained to the referees, but was entirely on the motion of defendant, who obtained an order of approval from the court without disclosure of the fact that the judgment was a prior lien, and should have been first paid. The record leaves no doubt but that the order would not have been granted had the facts been disclosed to the court. Subsequently John Cocke, to whom Sarah J. Cocke had assigned the judgment, intervened, asking that the portion of the order giving the mortgage priority be set aside. Mrs. Mosher joined issue, and upon hearing the order was so modified as to direct that the judgment be first paid.

The record leaves no doubt, but that the court was deliberately deceived into making this order. The explanations of the accused confirm, rather than obviate, this conclusion. His first excuse is that, as Onie Carter had assigned to him her share in the personal estate of the deceased to secure the satisfaction of the mortgage and judgment, enough would be realized to pay both anyhow. If so, why procure the order transposing the liens? But the assignment did not specify its purpose, and from Mrs. Carter's share of the proceeds of the real estate Mrs. Mosher's mortgage was satisfied, and but $34 and some cents was applied on the judgment of Mrs. Cocke. The balance remained unpaid

until after John Cocke procured the order to be set aside. Again, it is said that Mrs. Cocke was owing him for attorney's fees (and judgment was subsequently obtained by him for $122.50), and that her agent agreed that he should be paid from what he collected on her judgment, and that her agent had stated it did not make any difference which was paid first, the mortgage or the judgment, as all would go to Mosher anyway. If so, what could have been the object of the order that the mortgage should be first paid? The court evidently entertained a different view in the intervention suit as to what the agent had said. It will be observed, however, that no claim is made that any one was consulted with respect to the order, or consented to transposing the liens so that of Mrs. Mosher should be prior. That matter was even concealed from the referees. As another reason he claims to have acted upon the supposition that the land was the homestead of deceased, and that Mrs. Carter's share was exempt from the lien of Mrs. Cocke's judgment. Why could that have interested him if any unpaid balance after the application of her share of the land on the mortgage and judgment were to be paid from her share of the personal estate? Why did he not set up this exemption in his wife's answer in the intervention suit of John Cocke previously mentioned? Doubtless it had not occurred to him at that time. Even if " there was some reservation aside from the lease in reference to something or other in keeping some things in the house," this alone would not be sufficient to justify the conclusion that deceased, Moorman, had intended to return to live on the land after he had leased it and taken up his abode with a daughter in town. Conceding that he retained a room in the house, and slept there occasionally, he made his home with the daughter, and there is no pretense that he intended again to reside on the farm. Viewed in the most favorable light, the issue as to the exemption was doubtful, and defendant had no right to resolve that doubt in the interest of his wife against that of his other

client, Mrs. Cocke, without her consent, without informing
the referees, and procuring the order without disclosing the
point to be decided to the court.   These explanations do
not dovetail, and are evidently afterthoughts.

X.   On the 1st day of September of 1897, Estella
Basler, acting through her father, one Iago, loaned $1,000
through the accused to A. A. and Mahala Allen, to secure
which they executed a mortgage on the S. ½ of the S. W. ¼
of section 4 and on their interest in the E. ½, N. E. ¼,
N. E. ¼, of section 8, all in Tp. 76, R. 24.   Three days
prior to giving this mortgage, though unknown to Iago, the
S. W. ¼, S. W. ¼, of section 4 had been sold on execution,
and thereafter in due time a sheriff's deed issued.   The
land in section 8 was sold to pay the debts of the estate,
divesting the interest the Allens had mortgaged.   These sales
were known to the accused, as he was connected with the
litigation out of which they grew.   The Allens conveyed the
remaining land S. E. ¼, S. W. ¼ of section 4 to A. P.
Young in May, 1897, and the latter to Mosher in August
following.   A. A. McGarra began suit to subject this forty
acres to the payment of certain expenses and costs in parti-
tion proceedings in December, 1900, and obtained a decree
as prayed.   Sale was made to McGarra November 22, 1902.
Some time prior to this sale defendant had conveyed the
land to H. C. J. Goodale, and, as he claims, received from
him a duebill typewritten on a piece of paper about an inch
in width and three and one-half inches long, in language
following:   " I accept deed of L. L. Mosher to SE 4, SW 4,
T. 76, R. 24, of July 17, 1901.   I owe L. L. Mosher $1600
for same.   I agree to pay the Basler Mortgage of $1000.00,
and all taxes and redeem tax sales.   I waive all covenants
of warranty by reason of McGarry's suit.   Dated Apr. 5,
1902.   H. C. J. Goodale."   When it is added that this land
was never worth to exceed $1,600, this instrument seems
scarcely susceptible of explanation.   The defendant paid
Mrs. Basler the amount of the mortgage, and had her assign

in blank. It was in the hands of various parties, including Goodale, and finally came into the hands of the accused, as he claims, representing A. P. Young, a sister of his wife; that is, she had let him have money, which he agreed to repay, and he thinks her money went into it, although he had not charged himself with it on his books. Goodale died May 14, 1903, and Ede E. Law and D. J. Goodale were appointed administrators, by whom defendant was employed as attorney for the estate.

On the 24th day of September, 1903, he presented an application to the court for authority to pay taxes on land and for a monument, and in it merely recited that there was a mortgage on a certain lot, with some costs made thereon, and " also a mortgage on ·the southeast quarter of the southwest of 4 — 76 — 24, amounting to $1,086.96, drawing 8 per cent. This mortgage is also on land of other parties "; and another mortgage on same land in another township. At the same time, and without any explanation, he presented and procured to be signed by the court an order directing the administrators to pay the other two mortgages, " and, inasmuch as it is shown that the mortgage on the S. E. ¼, S. W. ¼, of 4 — 76 — 24 is also on the other land, they are directed to take an assignment thereof, and cancel same as to the said 40 acres, and hold same as a claim and lien on other lands." That he deliberately included in the order that for which the application signed by the administrator had not asked, and which the court, if advised, would not have granted, is not open to controversy. He knew, when he prepared it, that the other land was beyond the reach of a mortgage, and we have no doubt that reference to it was a subterfuge by which to induce the administrators to take up a mortgage which the estate was under no obligation to pay. At that time a sale of the land had been made to McGarra on which title in him was quieted in March, 1904. In view of the circumstances, we have no doubt that, as testified by Mrs. Law, he represented that one-half she paid to procure

an assignment of the mortgage under the order of the court would be replaced from its enforcement against other lands covered by it. Moreover, the administrators at that time knew nothing of the alleged duebill. The recital of these facts establishes the charge of unprofessional conduct toward the court as well as his clients, regardless of whether the order obtained was against their interest. A lawyer is not justified in resorting to deception in dealing with those for whom he acts, even though the outcome may happen to be without injury to them. Nor is an attorney excusable for including in an order prepared for the judge to sign material matter not included in the application. Even the order was a misrepresentation, for it indicated a statement that the mortgage covered other lands. Practically the only excuse presented is that he did not recollect at the time that the other lands were no longer covered by the mortgage. This cannot be accepted, as he was connected with all the litigation, and, besides, was directly interested in the mortgage itself.

In considering the several charges against defendant it has not been our purpose to review all the evidence introduced. That would be impractical where the abstract, as in this case, contains more than 300 pages. Enough has been said, however, to indicate our conclusions, and upon what they are based.

One of the requisites for admission to the bar is the possession of good moral character (section 310, Code), and by the consensus of judicial opinion it is also a requisite 10. DISBARMENT: for the rightful continuance in the profession. moral charac-
ter.    *In re O——*, 73 Wis. 602 (42 N. W. 221); *Bar Ass'n v. Greenhood,* 168 Mass. 169 (46 N. E. 568); *In re Wall,* 107 U. S. 265 (27 L. Ed. 552); *In re Percy,* 36 N. Y. 651; 4 Cyc. 906. The statute does not purport to include all the grounds for the revocation of licenses to practice as an attorney at law, and, even though ceasing to be of good moral character be not within the causes stated

in section 324 of the Code, the court had jurisdiction to disbar defendant on that ground. *In re Mills,* 1 Mich. 392; *Delano's Case,* 58 N. H. 5 (42 Am. Rep. 555); *State v. McClaugherty,* 33 W. Va. 250 (10 S. E. 407); *Sanborn v. Kimball,* 64 Me. 140; *Serfass' Case,* 116 Pa. 455 (9 Atl. 674); and cases last above cited. The moral delinquencies must be such, however, as shall unfit the person accused for the proper discharge of the trust reposed in him. Among these are the absence of common honesty and veracity, especially in all professional intercourse. Courts and clients of necessity repose great confidence in attorneys, and any one who has repeatedly betrayed this, and is likely to continue so to do, ought not to remain in the profession. Were the first two charges standing alone, we might be inclined to relegate the parties to such remedies as the law affords; but, when considered in connection with the last two, they tend strongly to indicate such a want of integrity as to disqualify the accused to act in any position of trust. In many matters the courts necessarily rely upon the representations of attorneys. Thus it is not the practice to read all the papers in the case before an order or decree is signed, and an attorney who cannot be relied upon to state accurately the contents of these, and the circumstances upon which they are based, and which justify making them, ought not to be tolerated as an officer of the court. The lawyer should never forget that he is a " minister of justice," nor allow his purely personal interests to divert him from the high duties of his office. The record before us bears indubitable evidence that greed of gain is responsible for the inexcusable deceits practiced by the defendant, and that the revocation of his license to practice law should be approved.— *Affirmed.*