THE STATE OF IOWA, Appellee, v. C. H. ROHRIG, Appellant.

Attorneys: DISBARMENT: EVIDENCE. Any unfaithful or fraudulent con-duct of an attorney, showing his unfitness to handle the business of others, is ground for disbarment; but in all such cases the evidence must be clear and satisfactory. In the instant case the evidence is held to show that defendant was guilty of misconduct in using the criminal procedure to force the collection of a client's claim; that he attempted to enforce the collection of exorbitant fees for services; that, acting alone or in conjunction with another in the same office, he intentionally failed to give credit for money col-lected; that he encouraged the commencement of litigation from motives of passion or prejudice; and that he was not possessed of a good moral character, either of which is sufficient to justify disbarment for the protection of the court and proper administra-tion of justice.

*Appeal from Fayette District Court.*—HON. A. N. HOBSON, Judge.

FRIDAY, FEBRUARY 14, 1913.

DISBARMENT proceedings. The defendant was found guilty. There was a judgment revoking his license to prac-tice law, and he appeals.—*Affirmed.*

*Hasner & Hasner,* for appellant.

*H. P. Hancock, C. H. Hughes* and *E. R. O'Brien,* for the State.

PRESTON, J.—There were fourteen accusations against the defendant, eight of which were sustained, and the defendant was acquitted of the other six. The abstract contains only the evidence as to the accusations upon which the defendant was found guilty. The charges which were sustained grow out of the defendant's dealings and connection with five matters, which we shall designate as the Steinke, Edmunds, Kammos, Truair, and Tarr matters. The defendant specifically denied all the accusations against him.

I. As to the Steinke matter, the specifications in the accusation are substantially that defendant used the criminal procedure to force the collection of a civil claim.

The evidence tends to show that about October 7, 1911, one Eda Steinke filed an information before a magistrate, charging one Charles Oswald with the crime of seduction; that the said Oswald agreed to pay her $50 if she would dismiss the proceedings; that the case was dismissed, but Oswald refused to pay the $50 or any part thereof; that about November 1, 1911, the said Eda went to the defendant's office and gave to one Young, who had an office with the defendant and was the defendant's collector, the facts in reference to the proceedings had on October 7th, and the dismissal and the agreement to pay.

The defendant testifies that he had no knowledge of the first prosecution, but Young testifies that he told the defendant, Rohrig, about the matter as the girl had related it. The matters were discussed between them after the defendant came into the office, and he thereupon drew up an information, charging Oswald with seduction, and sent the girl to a magistrate, who obtained the warrant and brought it to defendant's office. An officer was directed by Rohrig to arrest

Oswald and take him to defendant's office, which the officer did. Oswald was taken into the private office of the defendant, with Young and the girl. The officer was left in the front room. Defendant asked Oswald what he was going to do, and told him if they had anything to settle they could settle it; that defendant asked Oswald if he could get any money from his friends to pay the girl. The officer was sent away. Just before the officer left, the defendant came out of the back office and told him that Oswald "would fix it up all right," or that in substance; that the officer did not have Oswald in his charge further. It was late at night, and the defendant told them to come back in the morning, and that they could get together and fix the matter up.

The parties came back the next morning. The defendant went with Oswald to two different banks to see if he could get the money. Not succeeding in this, they returned to defendant's office. Defendant asked Oswald to sign a note, and prepared a note for $50. Oswald claims that Rohrig told him that if he would sign the note it would prevent his going to jail. After the note was signed, the defendant drew up a written dismissal of the criminal proceedings, and Oswald left defendant's office without being further prosecuted.

Oswald took the dismissal to the office of the magistrate, where the dismissal was entered. Oswald testifies that Rohrig told him that the giving of the note settled all the trouble, and it would prevent his going to jail, and that the girl would have proper care. He says that he had agreed to settle with the girl, but had not intended to do so before he was brought before Rohrig.

The note was turned over to Miss Steinke. Soon after that a suit was brought on the note against Oswald, and a judgment obtained. The suit on the note was brought by either Young or defendant, or both. Defendant admits that he may have prepared the petition. After judgment was obtained, Oswald's employer was garnished, and $25 and some costs were collected.

This is, in substance, the testimony in reference to this transaction, as testified to by four or five witnesses besides the defendant. The defendant's own testimony does not vary greatly from that given by the other witnesses who were present and who testified, though it is naturally shaded somewhat in his own favor.

The rule is, in this class of cases, that the proof should be clear and convincing. We think the evidence is clearly sufficient as to this accusation. In fact, the testimony of the defendant himself would be sufficient. The facts in this case are stronger than in the case of *State v. Johnson*, 149 Iowa, 462, where a similar charge was made. The fact that the amount obtained from Oswald, by the use or misuse of the criminal proceedings, was not large, is not material.

Two or more specifications are set out as to the accusation in regard to the Mae Edmunds case: First, that defendant was guilty of the crime of adultery with her in his office; and, second, that defendant was guilty of fraud, dishonesty, overcharging, oppression, and attempted extortion in his relations as an attorney with Mae Edmunds as his client; that he obtained a void and fraudulent judgment against her in the sum of $326.90; that the alleged claim was for services for which the charges were unreasonable, exorbitant, and unconscionable; and that defendant threatened her with criminal prosecution if she failed to pay said judgment.

We will first notice the matter as to the alleged overcharging, and refer to the question of adultery in connection with one or two other alleged adulterous transactions.

The items going to make the $326.90 were:

Attending to divorce matter and securing divorce,
    and matter pertaining thereto................$ 50 00
To attending to matters regarding obscene literature,
    with reference to the use of United States mail.. 100 00
To attending to matters connected with matter in
    Cresco in reference to property rights.......... 100 00

Attending to matters with reference to her children.. 25 00
Cash loaned .................................... 1 90
Consultation and preparation for trip to St. Paul,
    and delay and loss of time................... 50 00

As to the first item, the evidence shows that this woman was the defendant in the divorce case; that she had no defense, and did not expect to make any; that she simply asked the defendant to send her a copy of the decree when the divorce was granted, which he did. There was no contest of any kind, and she testifies that he told her that there was no charge. She also says this as to all the items, that the defendant told her there was no charge; and she also claims that the cash loaned, $1.90, was repaid by her to the defendant.

As to the $100 charge in reference to the obscene literature, there was no prosecution; and the testimony shows that the defendant first wrote the woman in reference to the matter, and asked her to call and see him about it.

The witness Edmunds says she may have talked to the defendant about property in Cresco, but that she, in fact, had no property, and there was no litigation.

She says her children were at Readlyn, and that she asked the defendant to drop her a line if he heard from them, and that she got one letter from him; that she did not employ him to perform any other services with reference to the children.

As to the St. Paul matter, she testifies that she did not employ him, but that defendant wanted her to go to St. Paul with him.

The defendant has but little to say in reference to these charges, or the services he performed, if any, for which the charges were made.

We are satisfied, from all the evidence on this point, that the services rendered by defendant for the woman, Mae Edmunds, if any were rendered, were trifling, and that the charges were clearly exorbitant.

A judgment was obtained for this amount; the woman not appearing in that suit. After the judgment was rendered, the defendant, Rohrig, filed a petition and obtained a citation for the appearance and examination of said Edmunds. The judgment was obtained in Fayette county, and on this citation she was brought from Howard county. The proceedings as to her examination were first continued, and then dismissed.

She testifies that defendant told her that he could obtain evidence to send her to the penitentiary, and that he would railroad her to the penitentiary, and that he would send her to jail·if she did not pay the judgment. This is denied by the defendant, but a letter from him was introduced in evidence, in which this sentence appears: "I believe you would rather go to jail than pay it." This, in connection with her evidence, is at least a veiled threat that· he would send her to jail if she did not pay the judgment. At any rate, it corroborates her testimony on that point.

The original notice was served on Mrs. Edmunds in Howard county, and judgment was taken in the superior court at Oelwein, in Fayette county. There may be some question as to whether the judgment was not taken before the requisite length of time had elapsed after the original notice was served on her, but the judgment was not void for that reason. There seems to be no evidence of collusion between defendant and Mrs. Edmunds in obtaining the judgment.

The evidence as to the Kammos matter is somewhat voluminous, so that it would be impracticable to discuss it at length. The accusation charges defendant with a lack of common honesty in this: That Kammos and wife paid to defendant $100 on a note owing by them to S. E. Young, and which was held by defendant for collection, but that defendant intentionally failed to indorse the same on the note; that defendant wrote a letter to said Kammos containing offensive personalities not required by the justice of

the cause; that thereafter, when said Kammos and wife were residents of South Dakota, and having property in Oelwein, Iowa, defendant commenced an attachment suit against them for the full amount of the original note and interest, and compelled Kammos to return to Iowa to make defense thereto; that the said Rohrig, when confronted by Kammos in open court, did thereupon indorse said sum of $100 on said debt.

S. E. Young, the payee of the note, is the same party who had an office and was a collector for the defendant; and these two were acting together in the Dakota land trade for which the note was given.

The deed conveying the Dakota property to Kammos was drawn by the defendant, and in the deed defendant named the consideration as $500; whereas it is the contention of Kammos and wife that it should have been $400.

About the time of this transaction Mrs. Kammos received, on the settlement of a partition suit, a draft for $494.90. This draft was deposited to her credit in the bank, being taken to the bank after banking hours. At that time a check was drawn by her to Young for $100 and delivered to defendant. A deposit slip was taken, on the back of which defendant placed the following: "C. H. Rohrig, $161.25; note, $50.40; S. E. Young, $100." These items represented the amount of checks that she had drawn against the amount of the deposit.

Kammos claims that this $100 referred to here was to apply on their note to Young, and that defendant agreed to so apply it and indorse it. The defendant claims that he did not have the note for collection, and that he did not receive the money. The check of $100 was made payable to S. E. Young, or order, and was indorsed by him.

As we have said, it would be impracticable to set out all of the evidence on this point within the proper limits of an opinion; but we have examined all the evidence, and hold that the trial court was justified in finding that either the defendant, or the defendant and Young, acting together, inten-

tionally attempted to defraud the Kammos people out of this $100, and to enforce the payment of the full amount of the note. In this connection, the defendant wrote the following letter to Mr. Kammos:

Aug. 5, 1911.  Otto E. Kammos, Wall, S. D. —Dear Sir: I beg to acknowledge the rotten, stinking, lying letter you wrote to Willis G. Kiefer, and no one but a lying cur would write it in the low down, stinking shiftless disposition of one who lays in the shade while his wife works. You say you want to fight Mr. Young and would not write more about your deal, you wrote enough that it will be necessary to more than a stinking, lazy cuss can fight in any event. September 11th is the day for your case to be called, and I wish to say that I am the man told you about this land, and you came back and said it was better than I represented it to be, and in presence of several persons in the office and street. If you desire I have the goods to prove a first class liar out of you and cost you nothing except the hard bumps for collaterals. I wish to advise you that I will press this matter to trial at once, for you ought not have any more consideration for you do not have any appearance of honesty for the man who befriended you. C. H. Rohrig.

After the writing of this letter, and after Kammos had come from Dakota to attend the trial, the credit of $100 in dispute was allowed without any further contest, and a judgment taken for the balance of the note.

It is no doubt true that a mere misunderstanding or dispute between the parties as to the $100 matter would not be ground for a disbarment of the defendant. But the intentional failure to give credit therefor is an entirely different matter.

The accusation as to the Truair matter accuses defendant with encouraging the commencement of actions from motives of passion or interest, and with immoral conduct in connection therewith.

As to the first part of this charge, the evidence tends to show that Mrs. Truair was a washerwoman, with a drunken

husband. She employed defendant to have the husband sent to the hospital for inebriates. After her husband had been sent away, defendant importuned her to let him bring an action for divorce, urging that she was a bright woman and ought not to live with her husband; that if he came back he would be liable to kill her, and that he had threatened to kill her; that if she was free from him he could not hurt her. She at first refused to allow defendant to bring the suit, informing defendant that her husband was a good man when sober. Later defendant brought suit for her, and a decree of divorce was granted, upon payment of costs. After the divorce was obtained, she told defendant she did not want a divorce, and refused to pay the costs. Defendant opposed her in her efforts to have the divorce decree annulled, and she employed another attorney for that purpose. Defendant told her she could not live with her husband, unless the costs were paid.

Defendant denies any improper conduct in the matter. Mrs. Truair is corroborated in some of the essentials of her story in regard to the divorce proceedings by defendant's letters to her. She also testifies that she told him she was pregnant, and that he suggested that he get medicine for her to produce an abortion; that at different times he requested her to permit sexual intercourse, which she refused; and that he took improper liberties with her person. All these matters are denied by defendant.

We are satisfied from the evidence that defendant did encourage the commencement of this action, as charged. It was his duty not to do so. Code, section 317. In telling Mrs. Truair that she could not live with her husband, unless the costs in the divorce case were paid, defendant must have known the payment of the costs would have made the divorce absolute, and that it would have been improper for her to live with her husband after the divorce.

At the conclusion of the state's evidence, it was permitted to amend the accusations to meet the proof by adding

Nos. 13 and 14. This was objected to by the defendant, on the ground that such amendment raised new issues, and that he was taken by surprise. No continuance was asked. We think no new issue was presented. The amendment simply made more specific the charges which had already been made in the original pleadings.

The trial court found defendant guilty of all the charges as to his alleged adultery with Mrs. Edmunds and Mrs. Tarr, and his solicitation and conduct with Mrs. Truair. In view of our findings as to the other charges, it will not be necessary to go into the evidence in detail as to these. We are at a disadvantage in not having seen and heard the witnesses, but if an affirmance depended on these transactions we would hesitate in finding defendant guilty of any of them. The transactions are alleged to have occurred in defendant's office. They are all denied by the defendant. The Edmunds woman testifies that the defendant had sexual intercourse with her a number of times; but she was not a pure woman, and she is not corroborated. She was angry at defendant because of his other treatment of her.

Mr. Tarr says he went to defendant's office and found his wife and defendant in a compromising situation. He is not corroborated. He was an old man, whose young wife had commenced divorce proceedings against him. Defendant was her attorney. Tarr does not testify that he saw them in the act of sexual intercourse, but that they were in defendant's private office, and defendant had his coat and vest off; that it was a hot day. He claims the office door was locked, but this is denied by defendant. On the day of this alleged transaction Tarr had been arrested at the instance of his wife; defendant acting as her attorney. He says that before he went to defendant's office he had suspicions against his wife and defendant, and he wanted to see what they were doing, expecting and determined to find them in a compromising position; that he had his mind made up that she was up there for improper intercourse with defendant.

Mrs. Truair is not corroborated as to defendant's improper solicitations.  Defendant was in his own office, where he had a right to be and to receive his clients.  It would be dangerous to say that, under such circumstances, the crime of adultery had been established with Mrs. Tarr and Mrs. Edmunds.  If this were enough, a reputable lawyer might be at the mercy of such clients.  But the fact that so many witnesses have testified to such facts should be considered, with all the other evidence in the case, as bearing on defendant's moral character, even though the specific charge of adultery as to each one is not made out.

In this connection we ought to say that defendant introduced a number of apparently reputable witnesses, who testified as to defendant's good moral character, or his reputation in that respect.  Notwithstanding this, we are satisfied from this record that defendant is not a man of good moral character.  If the defendant was now presenting himself to this court for admission, and we had this record before us, he would not be admitted.

Among the findings made by the trial court are the following:  "That defendant has shown himself to be and is lacking in common honesty; that he has shown himself to be and is lacking in general good moral character; that he has committed extortion by threats, deceit, and coercion against his clients; that he has been guilty of using the criminal procedure of the state of Iowa to force settlement of civil claims; that he has been guilty of stirring up litigation and trouble out of passion and interest; that he has been guilty of offensive personalities towards parties and witnesses which have been prejudicial to their honor and reputation."  In our opinion, these findings are all sustained by the evidence.

This opinion is already too long, but there are a number of accusations, and defendant has challenged the sufficiency of the evidence.  Judgment of disbarment is so severe that we feel it to be our duty to fully consider the matters presented for determination.  We are aware of the fact that lawyers

are often unjustly charged with improper conduct by defeated and disappointed clients and others. We would protect the members of the profession from all such, but when it is satisfactorily shown that a lawyer is unfit to practice his profession his license should be promptly and unhesitatingly revoked. This is necessary for the protection of the court, the proper administration of justice, the dignity and purity of the profession, the public good, and the protection of clients. *Ex parte Wall*, 107 U. S. 273 (2 Sup. Ct. 569, 27 L. Ed. 556); *State v. Finn*, 32 Or. 519 (52 Pac. 756).

II.    The legal questions involved in this appeal are not new or difficult. Any unfaithful or fraudulent conduct toward his client, showing the unfitness of the attorney to handle the affairs of others, is good ground for disbarment. *State v. Howard*, 112 Iowa, 256; 4 Cyc. 907.

Under our statute good moral character is an essential qualification for the admission of an attorney to practice, and he may be removed whenever he ceases to possess such character. *State v. Mosher*, 128 Iowa, 82; *In re O——*, 73 Wis. 602 (42 N. W. 225); 4 Cyc. 906. The judgment and order disbarring the defendant was fully justified.—*Affirmed.*